# Syllabus

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

VECTREN INFRASTRUCTURE SERVICES CORP v DEPARTMENT OF TREASURY

Docket No. 163742. Argued on application for leave to appeal April 5, 2023. Decided July 31, 2023.

Vectren Infrastructure Services Corporation, the successor in interest to Minnesota Limited, Inc. (ML), sued the Department of Treasury (the Department) in the Court of Claims, alleging that the Department had improperly assessed a tax deficiency against ML after auditing ML's Michigan Business Tax returns for 2010 and part of 2011. In 2010, Enbridge Inc. retained ML, a Minnesota-based company, to assist in the cleanup of a severe oil spill in Kalamazoo. In March 2011, while the Kalamazoo project was ongoing, ML sold all its assets to Vectren for $80 million. ML treated the sale for tax purposes as a sale of its assets under the federal tax code. ML timely filed its Michigan tax returns for 2010 and for the period in 2011 before the sale, January 1, 2011 to March 31, 2011 (the short year).

To tax only Michigan business activity, the Michigan Business Tax Act (the MBTA), MCL 208.1101 *et seq*., employs an apportionment formula. For a taxpayer whose business activities are subject to tax within and outside Michigan, its tax base is apportioned to Michigan by multiplying its tax base by the sales factor calculated under MCL 208.1303. The sales factor is a fraction, in which the numerator is total sales in the state during the tax year and the denominator is total sales of the taxpayer everywhere during the tax year. In its Michigan tax return for the short year, ML included the sale of its assets in the denominator of its sales factor. Following the audit, the Department determined that ML had improperly included its gain from the sale of its assets in the sales-factor denominator, resulting in an overstatement of its total sales and the reduction of its Michigan tax liability. The auditor excluded ML's sale of assets from the sales factor and included it in ML's preapportioned tax base, which increased ML's sales factor from 14.9860% to 69.9761% and consequently increased its tax liability. ML asked the Department for an alternative apportionment for the short year, but the Department denied ML's request and determined that ML had not overcome the presumption that the statutory apportionment fairly represented ML's business activity in Michigan for the short year.

Vectren filed suit in the Court of Claims, arguing, in part, that the Department's formulation of the sales factor for the short year resulted in a grossly distortive tax that violated the Equal Protection, Due Process, and Commerce Clauses of the Constitution. Both parties moved for summary disposition, and the court, COLLEEN A. O'BRIEN, J., granted summary

disposition for the Department. According to the court, the Department had properly included ML's gain from the sale of its assets in ML's tax base because the sale qualified as "business income" within the meaning of the MBTA. The court further concluded that ML was not entitled to an alternative apportionment. Vectren appealed, and the Court of Appeals, TUKEL, P.J., and SAWYER and RIORDAN, JJ., reversed the Court of Claims opinion and held that an alternative formula was required. 331 Mich App 568 (2020). The Department sought leave to appeal in the Supreme Court, and the Supreme Court vacated the Court of Appeals opinion and remanded the case to the Court of Appeals for the limited purpose of addressing whether the Department properly calculated and applied the apportionment formula. 506 Mich 964 (2020). The Court of Appeals in turn remanded the case to the Court of Claims for it to address whether Vectren's inclusion of the sale of the business's tangible and intangible assets in the denominator of the sales factor was proper, and the Court of Claims held that it was improper. Vectren again appealed, and the Court of Appeals, SAWYER and RIORDAN, JJ. (TUKEL, P.J., not participating), held that the Court of Claims had correctly analyzed the relevant statutes and applied the apportionment formula; however, the Court of Appeals adopted its original analysis regarding the constitutional defect present in applying the formula and concluded that Vectren was entitled to an alternative apportionment because applying the formula extended Michigan's taxing powers beyond their acceptable scope. 339 Mich App 117 (2021). Finally, the Court of Appeals ordered that the parties work together to determine an alternative method of apportionment. The Department again sought leave to appeal in the Supreme Court, and the Supreme Court ordered and heard oral argument on the application. 509 Mich 882 (2022).

In an opinion by Justice WELCH, joined by Justices BERNSTEIN, CAVANAGH, and BOLDEN, the Supreme Court, in lieu of granting leave to appeal, *held*:

The Department properly included the income from the ML-to-Vectren asset sale in the tax base apportionment formula under the MBTA, and the MBTA formula, as applied, did not impermissibly tax income outside the scope of Michigan's taxing powers and thus did not violate the Due Process or Commerce Clauses of the United States Constitution.

1. The Due Process Clause of the Fourteenth Amendment imposes two requirements on state taxation: a minimal connection or "nexus" between the interstate activities and the taxing state, and a rational relationship between the income attributed to the state and the intrastate values of the enterprise. The major requirement for taxing multistate corporations using an apportionment formula is that it must, under both the Due Process and Commerce Clauses, be fair. A multistate business's income from the sale of assets is apportionable for business tax purposes so long as the tax is assessed in a proportionate manner. A party challenging a business tax on the basis that it is disproportionate has a heavy burden of showing by clear and cogent evidence that the apportionment formula attributed income out of all appropriate proportion to the business activity in Michigan or that it led to a grossly distorted result.

2. The asset-sale income was statutorily apportionable and did not offend the Constitution. Under the MBTA, the tax liability owed by a unitary business was calculated by multiplying the tax base and the sales factor. Under MCL 208.1201(2), business income had to be included in the tax base of the apportionment formula, and under MCL 208.1303(10), ML's total sales in Michigan during the tax year had to be compared to ML's total sales everywhere during the tax year. MCL 208.1115(1) defined sales as property that can be inventoried and services sold; it did

not include the sale of a company. In this case, ML chose to treat the sale of its business to Vectren as a sale of assets. Accordingly, while the asset-sale income generated from the sale of ML to Vectren was business income and includable in the tax base, it was inappropriate to include the asset sale in either the sales-factor numerator or denominator. Because Vectren failed to show that the formula either was improperly calculated or unreasonably reflected the business transacted in the taxing year at issue, it had to be upheld.

3. There were no special constitutional protections that prohibited including business-sale income in ML's net income. United States Supreme Court caselaw outlined the proper legal test as not where the assets are physically located or where the company is domiciled for intangible assets but rather whether those assets play a part in the unitary business operations that subject the corporation to taxation in the taxing state in the first place.

4. ML's intangible assets were taxable. The method for measuring the value of intangible assets uses a forward-looking analysis. Where a company operated or whether it was reliable years before its sale does not matter as much as the company's scope and reliability immediately preceding the sale. The record in this case showed connections between Michigan and ML both before the sale and as a potential future growth market. ML had a business presence in Michigan for many years before the sale to Vectren, and Michigan remained a target for ML given ML's existing customers and planned market growth at the time of the sale. Accordingly, the fact that ML's net income during the short year was much greater than in previous years did not support the conclusion that the sales factor itself did not fairly represent the extent of ML's business activity in Michigan.

5. The apportionment formula did not violate the Due Process Clause. Under MCL 208.1309(3) and United States Supreme Court caselaw, the formula is rebuttably presumed to fairly represent the business activity attributed to the taxpayer in Michigan unless it can be demonstrated that the business activity attributed to the taxpayer in Michigan is out of all appropriate proportion to the actual business activity transacted in Michigan and leads to a grossly distorted result or would operate unconstitutionally to tax the extraterritorial activity of the taxpayer. A tax satisfies the Due Process Clause when the tax is applied to an activity with a substantial nexus with the taxing state, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the state. Fairness has two components: internal and external consistency. Internal consistency requires that if the formula was applied by every jurisdiction, it would result in no more than all the unitary business income being taxed. External consistency means that the factor or factors used in the apportionment formula must actually reflect a reasonable sense of how income is generated. In this case, the parties did not contest that ML had a substantial nexus with Michigan. The MBTA imposed a sales-only formula that attributed 70% of ML's business activity—including the asset-sale income—to Michigan for the 2011 short year. If every other state employed Michigan's test, the other jurisdictions in which ML operated would both (1) apportion the sale income and (2) divvy up the remaining 30% of sales and apply the same formula to the same tax base to calculate their apportioned share. Accordingly, the MBTA test was internally consistent. With regard to external consistency, Vectren had to show by clear and cogent evidence that the ML business activity attributed to Michigan was, in fact, out of all appropriate proportion to the business transacted in Michigan or led to a grossly distorted result, and Vectren, which did not dispute the amount of sales that occurred in Michigan, failed to do so. Taxing a company's entire taxable base using a

proportionality formula that accurately measures sales was appropriate and was not a gross distortion. ML made its money by completing contracts for services that were performed in numerous states, including Michigan. The asset sale's valuation—especially when considering intangible assets—was based on ML's ability to complete these service sales skillfully, on time, and within budget. Major Michigan-oriented contracts, including the contract with Enbridge, demonstrated that ML's intangible value extended to Michigan. When ML provided services during the relevant tax year in Michigan, Michigan was entitled to a share of the income generated from its sales in the ordinary course of business and its asset sale during that year. Vectren's other argument that the tax formula led to grossly distorted results inappropriately relied on historical tax liability without a convincing explanation as to why the historical taxes paid by a company are relevant to a different year's tax liability. Accordingly, the tax assessment did not violate the Due Process Clause.

6. The MBTA test did not violate the Commerce Clause. The Commerce Clause requires that a multistate business tax is applied to an activity with a substantial nexus with the taxing state, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the state. In this case, there was no dispute about the existence of a substantial nexus to Michigan, there was no claim that the tax discriminated against interstate commerce, and the tax was fairly apportioned to Michigan given the services ML was providing in Michigan at the time. Additionally, the tax was related to services provided by the state, including police and fire protection, the benefit of a trained work force, and the advantages of a civilized society. ML relied on local union workforces hired from local chapters to do intrastate work, rented most of its equipment intrastate for use on Michigan projects, engaged in highly regulated work constructing and repairing pipelines, and performed hazardous material cleanup related to oil pipelines. Vectren's proposed alternative calculations were requests for a geographical accounting that the United States Supreme Court has repeatedly rejected. Accordingly, the MBTA formula did not violate the Commerce Clause.

Court of Appeals judgment that Vectren demonstrated by clear and cogent evidence that the statutory apportionment formula created a grossly disproportionate result when applied to the one-time asset sale reversed; remainder of Court of Appeals opinion vacated; and case remanded to the Court of Claims.

Justice ZAHRA, joined by Chief Justice CLEMENT, dissenting, would have held that the Department's extraordinary upward assessment of ML's taxable income was unconstitutional and disproportionate. The Court of Appeals in this case provided a thorough and convincing analysis, and its decision should have been affirmed. ML had no physical assets permanently located in Michigan. The Department misallocated millions of dollars in equipment, labor, and intangible assets. In addition to the fact that the assets sold were almost entirely located outside of Michigan, the sale itself was by an out-of-state buyer, the ownership position was purchased from Minnesota owners, the sale involved out-of-state negotiations, and the sale relied on out-of-state intermediaries. Furthermore, the Department did not take into consideration that the 2011 short year was not a typical unitary business operation: during an unusual three-month period in which nationwide sales were low and Michigan's direct-to-consumer sales soared to unprecedented levels because of an environmental emergency, ML sold all its corporate rights, property, employee contracts, and intellectual property that it had built over decades through out-of-state activity and recouped a massive amount of income through an out-of-state corporate sale. A proper three-

factor valuation of ML's activities revealed almost no property footprint, minimal payroll, and insignificant sales in Michigan. But instead of using the three-factor model or the location of all sales, the Department used only direct-to-consumer sales and only for a three-month period. ML's proposal of 15% valuation to Michigan was reasonable and more in line with evaluations sanctioned by the United States Supreme Court. The Department calculated a more than 900% increase from attribution of the company's recent average sales history to Michigan and a 2,100% increase from the company's post-2000 sales history before the Kalamazoo River oil spill. This was not a reasonable attribution of regular business income in a unitary business. Accordingly, the tax Michigan imposed was constitutionally impermissible.

Justice VIVIANO, dissenting, agreed with the in-depth analysis of the facts of this case outlined in Justice ZAHRA's dissent but wrote separately to offer additional reasons why Vectren was entitled to use a reasonable alternative method of apportionment. Although the statutory apportionment formula treated the asset sale as taxable income, it completely failed to consider whether the profits from the sale were in any just sense attributable to transactions within Michigan. Because Michigan uses a single-factor sales formula, the formula was incapable of accounting for other variables. The Michigan sales factor during the 2011 short tax year was far from consistent with the sales factors from previous years. The question was not whether application of the single-factor sales formula fairly represented the income from the sale of ML's assets to Vectren; the question was whether application of that formula fairly represented the extent of ML's business activity in the state, and in this case, application of the formula did not fairly represent the extent of ML's business activity in Michigan. Justice VIVIANO would have held that Vectren proved by clear and cogent evidence that the income attributed to Michigan under the statutory apportionment formula was, in fact, out of all appropriate proportions to the business transacted in Michigan or has led to a grossly distorted result.

# OPINION

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

FILED  July 31, 2023

## STATE OF MICHIGAN

### SUPREME COURT

VECTREN INFRASTRUCTURE
SERVICES CORP., successor in interest to
MINNESOTA LIMITED, INC.,

　　　　Plaintiff-Appellee,

v                                                                No.  163742

DEPARTMENT OF TREASURY,

　　　　Defendant-Appellant.

BEFORE THE ENTIRE BENCH

WELCH, J.

　　　　As Benjamin Franklin famously noted, nothing is certain in life but death and taxes.
The wisdom of this statement is demonstrated through long-established caselaw affirming
the government's broad power of taxation.  In this matter involving highly unique
circumstances, extensive United States Supreme Court precedent mandates that we hold

that the Michigan Department of Treasury (Treasury) may assess Vectren Infrastructure Services Corporation (Vectren) the disputed business tax amount.

This case requires us to examine the ability of the state of Michigan to tax the income generated by the sale of Minnesota Limited, Inc. (ML), a Minnesota-headquartered company, to Vectren under the now-repealed Michigan Business Tax Act (the MBTA)[1] given ML's extensive operations in Michigan at the time of the sale. Specifically, this case involves a challenge to the constitutionality of Michigan's business tax apportionment formula under the MBTA and the resulting $2,262,994 tax assessment, along with interest and penalties after the company was sold.

Having considered the arguments and the record presented, we hold that (1) the income from the asset sale is properly attributable under the MBTA and (2) the MBTA formula, as applied, did not impermissibly tax income outside the scope of Michigan's taxing powers and thus did not violate the Due Process or Commerce Clauses of the United States Constitution. We therefore reverse the judgment of the Court of Appeals and remand this case to the Court of Claims for further proceedings that are consistent with this opinion.

## I. INTRODUCTION

State business income tax laws vary widely across the nation and are complex when multistate corporations are at issue. Michigan's business income tax system has changed

---

[1] The MBTA, MCL 208.1101 *et seq.*, was enacted by 2007 PA 36 and subsequently replaced by the Income Tax Act, MCL 206.1 *et seq.*, as amended by 2011 PA 38 and 2011 PA 39. However, the Income Tax Act was not signed into law until May 25, 2011, and became effective as of that date. See 2011 PA 39. Although certain companies who are not parties to this case were allowed to continue using the exemptions obtained under the MBTA after the Income Tax Act's passage, the last vestiges of the MBTA will phase out by tax year 2031. See 2019 PA 90, enacting § 1.

many times over the years in an effort to balance ease of administration with fairness for those conducting business in the state. The MBTA was implemented as part of an effort to cut and simplify corporate taxation in Michigan.[2] To understand the MBTA, it is helpful to first understand the formula used to calculate tax liability under the MBTA, so we first explain that formula. We then discuss the history of this case and the history of apportionment tax jurisprudence, including numerous decisions of the United States Supreme Court. Finally, we set forth how we are bound to apply that precedent and uphold Treasury's imposition of the MBTA tax.

## A. THE MBTA FORMULA

The MBTA imposed "a business income tax on every taxpayer with business activity within this state . . . ." MCL 208.1201(1). Specifically, "[t]he business income tax is imposed on the business income tax base, after allocation or apportionment to this state, at the rate of 4.95%." *Id*. For companies operating in multiple jurisdictions, the MBTA included a formula to "apportion" the income based on the estimated percentage of business done in Michigan as compared to other states. MCL 208.1201(2). A company's total taxable income—or the amount examined to determine tax liability—was calculated

---

[2] See MCL 208.1101(2) ("It is the intent of the legislature that the tax levied under this act . . . will serve to improve the economic condition of this state, foster continued and diverse economic growth in this state, and enable this state to compete fairly and effectively in the world marketplace for economic development opportunities that will provide for and protect the health, safety, and welfare of the citizens of this state, now and in the future."); see also Grob, *The Michigan Single Business Tax Is Going Away, But Slowly; First, Some Important Changes*, 78 Mich B J 1308, 1308 (1999) ("Almost continuously since its enactment in 1976, the [prior tax scheme, the Single Business Tax Act] has been criticized as being confusing, complicated and unfair to businesses.").

by multiplying the "tax base" by a "sales factor." The "sales factor" compares Michigan sales to all company sales to determine the proper proportionality of the overall tax.[3] The basic formula was as follows:

$$Apportioned\ Tax\ Base = (Tax\ Base) \times \left(\frac{Michigan\ Sales}{Total\ Sales}\right)$$

The MBTA defined the "tax base" as "a taxpayer's *business income*" subject to certain adjustments that are not relevant here. MCL 208.1201(2) (emphasis added). In turn, "business income" was defined as "that part of federal taxable income derived from business activity." MCL 208.1105(2). Additionally, "[f]or a partnership or S corporation, business income *include*[*d*] *payments and items of income* and expense *that are attributable to business activity of the partnership or S corporation and separately reported to the partners or shareholders*." *Id*. (emphasis added). "Business activity" was also a statutorily defined term that included

> transfer of legal or equitable title to . . . property, whether real, personal, or mixed, tangible or intangible, . . . with the object of gain, benefit, or advantage, whether direct or indirect, to the taxpayer or to others . . . . Although an activity of a taxpayer may be incidental to another or to other of his or her business activities, each activity shall be considered to be business engaged in within the meaning of this act. [MCL 208.1105(1).]

---

[3] Of note, while Michigan adopted a single-factor "sales factor" as a multiplier in the MBTA, each state is free to choose how many factors go into its apportionment modifier. See, e.g., *Moorman Mfg Co v Bair*, 437 US 267; 98 S Ct 2340; 57 L Ed 2d 197 (1978) (discussing the differences between a single-factor multiplier in Iowa and a three-factor multiplier in Illinois); see also *Trinova Corp v Dep't of Treasury*, 433 Mich 141, 151-152; 445 NW2d 428 (1989) (*Trinova I*) (describing Michigan's three-factor formula under its previous tax regime—the Single Business Tax Act).

The "sales factor" in the MBTA apportionment formula was "a fraction, the numerator of which is the total sales of the taxpayer in this state during the tax year and the denominator of which is the total sales of the taxpayer everywhere during the tax year." MCL 208.1303(1). "Sales" were defined as "the amounts received by the taxpayer as consideration from . . . [t]he transfer of title to, or possession of, property that is *stock in trade* or other property of a kind that would properly be *included in the inventory* of the taxpayer . . . ." MCL 208.1115(1)(a) (emphasis added). For service-based companies, like ML, "sales" also included the "performance of services that constitute business activities." MCL 208.1115(1)(b). In short, to determine the sales factor for a unitary business, sales of goods and services in Michigan were compared to total companywide sales of goods and services for the tax year. MCL 208.1301(1); MCL 208.1303(1).

The formula was "rebuttably presumed to fairly represent the business activity attributed to the taxpayer in this state . . . ." MCL 208.1309(3). However, if a taxpayer could demonstrate "that the business activity attributed to the taxpayer in this state [was] out of all appropriate proportion to the actual business activity transacted in this state and [led] to a grossly distorted result or would operate unconstitutionally to tax the extraterritorial activity of the taxpayer," an alternative apportionment was mandated. MCL 208.1309(3). An alternative method could only be used "if it [was] approved by the department." MCL 208.1309(2).

The dispute in this case concerns whether the MBTA's statutory tax liability formula controlled or whether the taxpayer has shown by clear and cogent evidence that an alternative apportionment formula, as allowed by MCL 208.1309, should have been used. Vectren asserts that the statutory tax apportionment formula resulted in a tax liability

5

that was disproportionate to the business done in Michigan, leading to a grossly distorted result.

## B. FACTS AND PROCEEDINGS

The facts leading to this case are complex and unlikely to repeat. Justice ZAHRA's dissent decries our decision today as opening the door to the state engaging in highway robbery against taxpayers as soon as their toe crosses our borders. A more reasonable view is that our decision today deals with a complex asset sale of a unitary business operation, a tax return filed by that business using a self-created formula directly contrary to the relevant statute, an audit which caught the use of the self-created formula, and the one-off ramifications when that asset sale coincided with large Michigan sales under a now-replaced business tax.

Vectren is the successor in interest to ML. ML was an S corporation headquartered in Big Lake, Minnesota. It engaged in the business of constructing, maintaining, and repairing gas pipelines and providing hazardous material cleanup response to leaks. Founded in 1966, ML grew to employ more than 600 employees and engaged in work in 24 states, including Michigan. By the mid-1990s, ML was wholly owned by two of the founder's children. In 2010, ML's owners decided to sell the business.

In July 2010, a break in Enbridge Inc.'s Line 6B pipeline resulted in a catastrophic spill of more than 1.1 million gallons of oil into the Kalamazoo River, Talmadge Creek, and surrounding wetlands.[4] ML was hired to do the environmental cleanup work, which

---

[4] Matheny, *Enbridge Hit with a $177M Bill for Michigan, Illinois Oil Spills*, Detroit Free Press (July 20, 2016), <https://www.freep.com/story/news/local/michigan/2016/07/20/enbridge-reaches-177m-settlement-oil-spills/87336380/> [https://perma.cc/MH9F-7KFP].

was massive in scope and still ongoing when ML sold all its tangible and intangible assets to Vectren for roughly $89 million in 2011.[5] The sale price included $83.4 million in cash and $5.2 million in assumption of debt. The assets purchased included $14.8 million of working capital; $34.4 million of property, plant, and equipment; $19.1 million of identifiable intangibles;[6] and $20.3 million of implied goodwill.

Given its operations in Michigan, ML filed a Michigan tax return for the period between January 1, 2011 and March 31, 2011, which is known as a "short-year" return. In its tax return, ML included the sale of business assets in the "tax base." It also included the asset sale in the *denominator* of the sales-factor apportionment formula. As a result, ML claimed a sales factor of 14.99%, which resulted in a Michigan-apportioned tax base of $8,186,266 and a tax assessment of a $405,220.17.

In December 2014, Treasury initiated an audit for ML's 2010 calendar year and the 2011 short-year tax returns. Treasury determined that ML's 2011 short-year return was calculated incorrectly. Specifically, Treasury found that ML's inclusion of the ML-to-Vectren asset-sale value in the sales-factor denominator was improper under MCL

---

[5] The sale from ML to Vectren on March 31, 2011, was structured as an asset sale—including capital assets and intangible assets of receivables, retainages, cash, prepaid expenses, inventory, stock, and goodwill—under the Internal Revenue Code, 26 USC 338(h)(10). ML was the operative taxpayer during the relevant proceedings, but Vectren, as the purchasing entity, was responsible for the tax bill. As a result, both ML and Vectren are discussed in this opinion, but ultimately Vectren is the responsible party and the plaintiff who filed this lawsuit.

[6] Vectren hired an accounting firm, KPMG International Limited, to prepare a valuation of the company during sale negotiations. Per that report, this included $4,241,000 in trade name value, $14,588,000 in customer relationships, and a project backlog valued at $287,000.

208.1115 because the assets were not sold as part of the "stock in trade" of the company nor were the sold assets "property held by the taxpayer primarily for sale to customers in the ordinary course of the taxpayer's trade or business."[7]

In other words, the sale of ML to Vectren was not the same thing as selling a product or service (such as oil spill cleanup or pipeline maintenance services). Treasury determined that while the tax base should include the amount of the ML sale to Vectren, it was improper to include the sale of business assets in the sales factor. Instead, Treasury determined that the sales factor should have been 69.9571%, the apportioned business income tax base should have been $38,316,659, and the tax owed should have been $2,926,765.07, including penalty and interest. Treasury therefore issued a notice of intent to assess to ML.[8]

After receiving the notice from Treasury, Vectren asked for an informal conference, requesting alternative apportionment for the short year due to its belief that all the receipts

---

[7] Inexplicably, Justice ZAHRA's dissent repeatedly characterizes ML's initial filing as "offering" a 15% apportionment as if taxes were gifts and not obligations. ML did not "offer" to calculate its apportionment at 15% as a compromise or out of some sense of goodwill. Rather, despite being a sophisticated entity with professional advisors, ML replaced the method for calculating the statutory apportionment formula with its own formula that made it appear as if it owed far less in taxes than it actually owed under the law. ML only argued that the proper formula was unconstitutional after it was caught through the audit process three years later. MCL 208.1309(1) allowed for a taxpayer to "petition for" the inclusion of separate accounting, inclusion of additional or alternative factors, or other alternative methods before filing its tax return. ML never petitioned Treasury for any of the five alternatives Vectren proposes here. Rather, ML got caught having miscalculated its liabilities and now seeks to justify its actions.

[8] Treasury issued Notice of Intent to Assess No. UO71593 to ML at its Big Lake, Minnesota, headquarters on April 20, 2016. However, by that time, Vectren was the successor in interest to ML and ultimately responsible for the tax burden.

8

and income from the sale of its company should be considered as "sales" in the sales factor and exclusively allocated to Minnesota. In the alternative, Vectren asked for the sale to be wholly excluded from the apportionment formula, including the tax base, given that the asset sale was not in ML's regular course of business and was therefore not "business income." To include the sale-of-business income, it contended, meant that the tax was "out of all appropriate proportion" with the business actually transacted in Michigan and thus the tax violated Vectren's due-process rights as well as the Commerce Clause by taxing money earned beyond Michigan's taxing power.

Treasury denied Vectren's request. It found:

> While you have provided detail on how the selling price was derived, you have not provided any evidence to the Department that the business activities in Michigan did not contribute to the gain realized or that the formula does not provide Michigan with an equitable allocation of income. Further, including gain in the tax base is not an unusual fact situation or one that necessarily demonstrates that application of the statutory apportionment formula does not reflect [ML's] business activity in Michigan.

Consequently, Treasury determined that Vectren had not overcome the presumption that the statutory apportionment formula fairly represented what was then ML's business activity in Michigan for the period at issue. Soon after the denial, Treasury issued its final assessment for the short year, reaffirming that the amount owed with penalty and interest was $2,926,765.07.

## 1. VECTREN FILES THE PRESENT LAWSUIT

After Treasury denied Vectren's request for alternative apportionment, Vectren sued Treasury in the Court of Claims. Its complaint contained four counts, summarized as follows:

9

I. Treasury's failure to include the gain from the sale of ML in the denominator of the sales factor resulted in a grossly distortive tax because the calculation did not fairly represent ML's business activities in the state, violating the Due Process and Commerce Clauses of the federal Constitution;

II. In the alternative, the gain on the asset sale was nonoperational, nonrecurring, nonbusiness income that should be excluded from ML's tax base, and if not excluded, the state violated the Due Process and Commerce Clauses of the federal Constitution;

III. Treasury unlawfully calculated ML's tax base by including the gain on the sale of ML, and under the plain language of the MBTA, the sale of shareholders' stock is not a business activity to be included in an S corporation's tax base and federal method of accounting; and

IV. The penalty for untimeliness should be abated because the plaintiff timely paid the tax on the basis of reasonable interpretations of the MBTA.

The Court of Claims granted Treasury's motion for summary disposition, determining that the business income was properly subject to taxation under the MBTA and that alternative apportionment was not required. The Court of Claims found that Vectren did not dispute that ML's Michigan sales as defined by the statute made up 70% of its total sales for the short year in question. Nor did Vectren argue that the formula was misapplied. Rather, the crux of Vectren's argument was that it did not agree with what was included in the tax base because it increased the total income subject to taxation.

The Court of Claims also rejected Vectren's arguments relating to the value of the goodwill that ML accrued at the time of ML's sale to Vectren. It noted that Vectren failed to cite any documentary evidence to support its assertion that none of the goodwill

accumulated over the 52-year history of ML could be attributed to the company's business activities in Michigan. The court disagreed with Vectren's argument that because the imposed tax purports to tax the value of the goodwill that the company accumulated, it extended beyond the actual business activity that ML had conducted in Michigan. Besides not meeting the clear and cogent evidence standard in support of its assertion regarding goodwill, the court explained that under the precedent of this Court and the United States Supreme Court, it is not a constitutional requirement that a state's apportionment formula have surgical precision in identifying attributable income.

## 2. INITIAL APPEAL TO THE COURT OF APPEALS AND THIS COURT

Vectren appealed the grant of summary disposition to the Court of Appeals. In a published decision, the Court of Appeals reversed the Court of Claims' opinion and held that an alternative formula was appropriate. The Court of Appeals held that "this is an exceptional case in which the taxpayer has met its burden of providing clear and cogent evidence that the business activity attributed to it 'is out of all appropriate proportion to the actual business activity transacted in this state and [has led] to a grossly distorted result.' " *Vectren Infrastructure Servs Corp v Dep't of Treasury*, 331 Mich App 568, 583; 953 NW2d 213 (2020) (*Vectren I*) (citation omitted), vacated 506 Mich 964 (2020).

The Court of Appeals held that because applying the statutory formula meant that a higher percentage of ML's income was subject to taxation in the 2011 short year (approximately 70%) than the 10-year average of the decade prior (approximately 7%), it did not "fairly represent" the business done in the state. *Vectren I*, 331 Mich App at 577-578, 583. On the basis of that determination, the court held that the tax unconstitutionally

11

included income outside the scope of the business transacted in Michigan. The panel did not address Vectren's remaining allegations because it found the need to use an alternative formula dispositive. Treasury moved for reconsideration, and the motion was denied. Treasury subsequently sought leave to appeal in this Court.

This Court issued an order vacating the Court of Appeals opinion and remanding the case to the Court of Appeals for the limited purpose of addressing whether Treasury properly applied the apportionment formula. *Vectren Infrastructure Servs Corp v Dep't of Treasury*, 506 Mich 964 (2020).

### 3. PROCEEDINGS ON REMAND

The Court of Appeals, in response to our remand order, in turn remanded the case to the Court of Claims for it to address Count I of Vectren's complaint, which alleged that failure to include the sale-of-business amount in the denominator of the sales-factor formula improperly skewed its overall tax liability. The Court of Claims again agreed with Treasury, holding that the asset sale at issue was not a "sale" as defined by MCL 208.1115(1)(a) because "inventory" does not include assets beyond those sold in "the ordinary course of the taxpayer's trade or business." Because the assets sold were not held out in the ordinary course of business for sale, the Court of Claims reasoned that it was improper to include the sale of the business's tangible and intangible assets in the denominator of the sales factor. Although the sale of ML to Vectren was "business activity" and thus was required to be included in the tax base, it was not a "sale" for purposes of calculating the sales factor, because that calculation only includes sales of products or services by a business in its ordinary course of business, and therefore should

not have been included in the denominator of the sales factor calculation. Accordingly, the Court of Claims granted Treasury summary disposition as to Count I of Vectren's complaint.

Vectren once again appealed to the Court of Appeals, which issued a published opinion holding that the Court of Claims had correctly analyzed the relevant statutes and applied the apportionment formula. *Vectren Infrastructure Servs Corp v Dep't of Treasury (On Remand)*, 339 Mich App 117, 124; 981 NW2d 116 (2021) (*Vectren II*). However, the Court of Appeals adopted its original analysis regarding the constitutional defect present in applying the formula and concluded that Vectren was entitled to an alternative apportionment because applying the formula extended beyond the acceptable scope of Michigan's taxing powers. *Id*. Finally, the Court of Appeals ordered that the parties work together to determine an alternative method of apportionment. *Id*.

Treasury again sought leave to appeal in this Court. We granted oral argument on the application and ordered the parties to address

> (1) whether the taxpayer established by clear and cogent evidence that "the business activity attributed to it in this state 'is out of all appropriate proportion to the actual business activity transacted in this state and leads to a grossly distorted result' " under MCL 208.1309(3) of the Michigan Business Tax Act, MCL 208.1101 *et seq*.; (2) whether application of the statutory formula in this case runs afoul of the Due Process and Commerce Clauses incorporated in the statute because it does not fairly determine the portion of income from the sale of a business attributed to in-state activities; and (3) whether remand for the parties to determine an alternate method of apportionment conflicts with MCL 208.1309(2), which vests exclusive authority to approve an alternate method of apportionment in the Department of Treasury. [*Vectren Infrastructure Servs Corp v Dep't of Treasury*, 509 Mich 882, 882 (2022).]

## II.  STANDARDS OF LAW

### A.  STANDARD OF REVIEW

Agency interpretations of the statutes they are charged with implementing are generally given "respectful consideration" so long as they are consistent with the plain language of the statute.  *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 93; 754 NW2d 259 (2008).  However, we review a trial court's grant of summary disposition de novo.  *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999).  We also review questions of statutory interpretation and constitutional law de novo.  *Fluor Enterprises, Inc v Dep't of Treasury*, 477 Mich 170, 174; 730 NW2d 722 (2007).

### B.  RELEVANT LEGAL CONSIDERATIONS

A long-settled principle of tax law is that "the entire net income of a corporation, generated by interstate as well as intrastate activities, may be fairly apportioned among the States for tax purposes by formulas utilizing in-state aspects of interstate affairs."  *Exxon Corp v Wisconsin Dep't of Revenue*, 447 US 207, 219; 100 S Ct 2109; 65 L Ed 2d 66 (1980) (quotation marks and citation omitted).  The Due Process Clause of the Fourteenth Amendment imposes two requirements on state taxation: a "minimal connection" or "nexus" between the interstate activities and the taxing state, and a "rational relationship between the income attributed to the State and the intrastate values of the enterprise."  *Mobil Oil Corp v Comm'r of Taxes of Vermont*, 445 US 425, 436-437; 100 S Ct 1223; 63 L Ed 2d 510 (1980).  The major requirement for taxing multistate corporations using an apportionment formula is that it "must, under both the Due Process and Commerce Clauses, be fair."  *Container Corp of America v Franchise Tax Bd*, 463 US 159, 169; 103 S Ct 2933;

77 L Ed 2d 545 (1983). This requires that a formula have both "internal consistency" and "external consistency." *Id*.

To be internally consistent, a formula must "result in no more than one hundred percent of the taxpayer's business activity being taxed if all taxing jurisdictions employed the same formula." *Trinova Corp v Dep't of Treasury*, 433 Mich 141, 158; 445 NW2d 428 (1989) (*Trinova I*). External consistency "requires that the choice of factors used in the formula 'must actually reflect a reasonable sense of how the business activity is generated.' " *Id*. (citation and brackets omitted). When a taxpayer attacks "the tax base rather than the formula," it "substantially narrows the issues before [the court]." *Mobil Oil Corp*, 445 US at 434. It limits the inquiry "to the question whether there is something about the character of income earned" from the sale of assets "that precludes, as a constitutional matter, state taxation of that income by the apportionment method." *Id*. at 435. Here, Vectren attacks both the inclusion of the ML-to-Vectren asset-sale income in the tax base and, in the alternative, the formula itself. For that reason, we will address both challenges.

As with most apportionment taxes, the MBTA stated that the statutory apportionment formula

> shall be rebuttably presumed to fairly represent the business activity attributed to the taxpayer in this state . . . unless it can be demonstrated that the business activity attributed to the taxpayer in this state is out of all appropriate proportion to the actual business activity transacted in this state and leads to a grossly distorted result or would operate unconstitutionally to tax the extraterritorial activity of the taxpayer. [MCL 208.1309(3).]

Significantly, the protesting taxpayer can only successfully challenge an apportionment finding with "clear and cogent" evidence. See *Trinova I*, 433 Mich at 158. Clear and

15

cogent evidence means "more than a preponderance of evidence . . . . [T]he standard is much like 'clear and convincing evidence.' " *McQueen v Black*, 168 Mich App 641, 645 n 2; 425 NW2d 203 (1988); see also *Black's Law Dictionary* (11th ed), p 698 ("Evidence indicating that the thing to be proved is *highly probable or reasonably certain*. This is a greater burden than preponderance of the evidence, the standard applied in most civil trials, but less than evidence beyond a reasonable doubt, the norm for criminal trials.") (emphasis added).

## C. SURVEY OF THE RELEVANT CASELAW

The constitutionality of taxation of businesses that are located in more than one state has been debated for more than a century. The United States Supreme Court has issued many opinions that have extensively analyzed the issue. A survey of the applicable caselaw is necessary to understand our decision.

In *Underwood Typewriter Co v Chamberlain*, 254 US 113; 41 S Ct 45; 65 L Ed 165 (1920), the United States Supreme Court examined the appropriateness of a Connecticut business income tax. The taxpayer was a Delaware corporation that engaged in the manufacture and sale of typewriters and had its main offices in New York. The Connecticut business tax statute imposed a 2% tax on the "net income earned during the preceding year from business carried on within the state . . . ." *Id*. at 117. When a company was engaged in both intrastate and interstate commerce, the statute used a single-factor proportionality calculation—a comparison of the business's in-state property against the total property—to apportion income. *Id*. at 118.

Because Underwood Typewriter's manufacturing facilities were primarily located in Connecticut, the state determined that 47% of its net income was subject to taxation by Connecticut, despite the fact that only 3.3% of its national revenue was generated in Connecticut. *Id*. at 120. In affirming the tax, the United States Supreme Court held that the taxes are "not obnoxious to the commerce clause merely because [they are] imposed upon property used in interstate commerce . . . . That a tax measured by net profits is valid, although these profits may have been derived in part, or indeed mainly, from interstate commerce, is settled." *Id*. The Supreme Court went on to hold that "profits of the corporation were largely earned by a series of transactions beginning with manufacture in Connecticut and ending with sale in other states. In this it was typical of a large part of the manufacturing business conducted in the state." *Id*. at 120-121.

In *Bass, Ratcliff & Gretton, Ltd v State Tax Comm*, 266 US 271, 277; 45 S Ct 82; 69 L Ed 282 (1924), the United States Supreme Court addressed the constitutionality of a New York statute that imposed a 3% franchise tax on the net income of a corporation. If the business engaged in interstate or foreign commerce, apportionment was determined "by [examining] the proportion which the aggregate value of specified classes of the assets of the corporation within the State bears to the aggregate value of all such classes of assets wherever located." *Id*. at 278. These assets included tangible property, real property, bills, accounts receivable, and shares of stock in other corporations. *Id*. The tax was challenged by a British company that brewed and sold beer; the company's manufacturing operations and a significant portion of its sales were in England, but the company had branch offices in New York and Chicago that had no net income in the challenged tax year. *Id*. at 278-279. The Supreme Court upheld the net income tax in New York, which included foreign

17

income, because the company "carried on the unitary business of manufacturing and selling ale, in which its profits were earned by a series of transactions beginning with the manufacture in England and ending in sales in New York and other places[.]" *Id*. at 282. Because "the process of manufacturing result[ed] in no profits until it end[ed] in sales . . . the State was justified in attributing to New York a just proportion of the profits earned by the Company from such unitary business." *Id*. The Supreme Court also held that it was appropriate to include the intangible assets, such as accounts receivable and stock owned in other corporations, in its taxation formula. *Id*. at 283.[9]

In contrast, the United States Supreme Court invalidated North Carolina's application of its business taxation scheme in *Hans Rees' Sons, Inc v North Carolina*, 283 US 123; 51 S Ct 385; 75 L Ed 879 (1931). There, a New York company challenged North Carolina's tax apportionment formula that attributed roughly 80% of the company's income to the state for taxation purposes, even though during the relevant tax years "the average income [from] . . . the manufacturing and tanning operations within the State of North Carolina was seventeen per cent" and "did not in any event exceed 21.7 per cent." *Id*. at 134 (quotation marks omitted). The Court held that "with respect to the facts shown,

_____

[9] See also *Nat'l Leather Co v Massachusetts*, 277 US 413, 423; 48 S Ct 534; 72 L Ed 935 (1928) (upholding a Massachusetts tax imposed on the capital stock of two subsidiary corporations domiciled in Maine and finding that it was permissible for Massachusetts to tax the subsidiaries' stock, regardless of the stock's situs or commercial domicile, because the companies themselves transacted business within Massachusetts and were "employed by the petitioner in carrying on its business within Massachusetts"); *Ford Motor Co v Beauchamp*, 308 US 331, 334, 336; 60 S Ct 273; 84 L Ed 304 (1939) (upholding an allocation of taxable capital to Texas in excess of $23 million despite the taxpayer only having roughly $3 million in in-state assets because with "a unitary enterprise, property outside the state, when correlated in use with property within the state, necessarily affects the worth of the privilege within the state").

the statutory method, as applied to appellant's business for the years in question operated unreasonably and arbitrarily, in attributing to North Carolina a percentage of income out of all appropriate proportion to the business transacted . . . in that state." *Id*. at 135-136.

California's taxation of out-of-state transactions was upheld in *Butler Bros v McColgan*, 315 US 501; 62 S Ct 701; 86 L Ed 991 (1942). That case dealt with a wholesale company that operated seven "distributing houses" in seven states, including California. *Id*. at 504. The company challenged a California tax that apportioned roughly 8% of the company's approximately $1.15 million profit to California because the California division of the company operated at a loss of almost $83,000. *Id*. at 504-505. The Supreme Court found that despite the internal accounting methods used, income generated from *entirely out-of-state transactions* by warehouses located *in those states* was still reachable by California. *Id*. at 508. This is because the business was unitary. *Id*. Thus, California was entitled to apportion the entire income of the company based on the relevant factors under its unitary business tax—despite the actual loss the company's California division experienced.

In *Norfolk & W R Co v Missouri State Tax Comm*, 390 US 317, 319; 88 S Ct 995; 19 L Ed 2d 1201 (1968), the United States Supreme Court invalidated a Missouri ad valorem tax on Norfolk's "rolling stock" of railcars. The Missouri tax was calculated by determining the value of all rolling stock owned by the railroad, then multiplying it by an apportionment factor based on the miles of Missouri railroad compared to total national railroad. *Id*. at 320-321. Norfolk leased rolling stock and railroad from a smaller rail company (Wabash) that primarily operated in Missouri. *Id*. at 319. Prior to the lease, Norfolk did not operate in any meaningful way within Missouri and never moved its

19

existing rolling stock into the state, meaning that almost all its operations in the relevant tax years were based upon use of Wabash's rolling stock. *Id*. However, because the statute assessed the *entirety* of Norfolk's rolling stock to determine the tax base, its application led to a substantially higher tax assessment. The Court noted that the "rigid application" of the statute led to a rolling stock assessment of $19,981,757. *Id*. at 326. However, that was more than double the previous year's valuation; the only difference was the size of the company.

Norfolk demonstrated by clear and cogent evidence that "it is chiefly a coal-carrying railroad, 70% of whose 1964 revenue was derived from coal traffic," which "require[d] a great deal of specialized equipment, scarcely any of which ever enter[ed] Missouri." *Id*. at 328. It further established that the traffic density on the newly leased tracks was low when compared to the railway as a whole, and "it proved that the overwhelming majority of its rolling stock regularly present in Missouri was rolling stock it had leased from . . . Wabash." *Id*. This evidence was sufficient to prove that the apportionment formula, as applied, was a gross exaggeration of Norfolk's unitary business activity within the state.

In *Moorman Mfg Co v Bair*, 437 US 267, 269; 98 S Ct 2340; 57 L Ed 2d 197 (1978), an Illinois corporation challenged Iowa's business tax apportionment scheme. The apportionment formula for income that was not "easily [geographically] identifiable" was a single-factor analysis comparing gross sales made within the state with total gross sales. *Id*. (quotation marks and citation omitted). The United States Supreme Court held that "a single-factor formula is presumptively valid." *Id*. at 273. The Court rejected Moorman's argument that the tax was unconstitutional because a substantial portion of the income

20

attributed to Iowa was actually due to the company's manufacturing operations in Illinois. *Id*. at 272. The Court responded to Moorman's claim that there was duplication in taxation by holding as follows:

> It is, of course, true that if Iowa had used Illinois' three-factor formula, a risk of duplication in the figures computed by the two States might have been avoided. But the same would be true had Illinois used the Iowa formula. Since the record does not reveal the sources of [Moorman]'s profits, its Commerce Clause claim cannot rest on the premise that profits earned in Illinois were included in its Iowa taxable income and therefore the Iowa formula was at fault for whatever overlap may have existed. [*Id*. at 277.]

The Court refused to "constitutionalize[]" the formulas used by the states because to do so would "require a policy decision based on political and economic considerations that vary from State to State." *Id*. at 279-280.

In *Mobil Oil Corp*, 445 US at 427, the United States Supreme Court decided whether Vermont could impose its corporate income tax on dividend income of foreign subsidiaries doing business abroad that had no business activity within the state.[10] Mobil's business in Vermont was solely related to "wholesale and retail marketing of petroleum and related products" and had "no oil or gas production or refineries within the State." *Id*. at 428. Mobil argued that "taxation of the dividend receipts under Vermont's corporate income tax violated the Due Process Clause of the Fourteenth Amendment, as well as the Interstate and Foreign Commerce Clause, . . . [and] that inclusion of the dividend income in its tax base . . . would not result in a 'fair' and 'equitable' apportionment . . . ." *Id*. at 432. The United States Supreme Court disagreed.

---

[10] These included subsidiaries incorporated and operating in states other than Vermont as well as foreign corporations doing business outside the United States.

21

Comparing it to cases in which taxpayers asked for a "geographical accounting" of profits, or cases in which companies operated in the United States and abroad, the Court reiterated that "the linchpin of apportionability in the field of state income taxation is the unitary-business principle." *Id*. at 438-439. Specifically, the Court noted:

> [S]eparate accounting, while it purports to isolate portions of income received in various States, may fail to account for contributions to income resulting from functional integration, centralization of management, and economies of scale. Because these factors of profitability arise from the operation of the business as a whole, it becomes misleading to characterize the income of the business as having a single identifiable "source." Although separate geographical accounting may be useful for internal auditing, for purposes of state taxation it is not constitutionally required. [*Id*. at 438 (citation omitted).]

Thus, "what [Mobil Oil Corp] must show, in order to establish that its dividend income is not subject to an apportioned tax in Vermont, is that the income was earned in the course of activities *unrelated to the sale of petroleum products in that State*." *Id*. at 439 (emphasis added). The Supreme Court also found that the Vermont tax did not violate the Commerce Clause by "subject[ing] interstate business to a burden of duplicative taxation that an intrastate taxpayer would not bear." *Id*. at 443. In doing so, the Supreme Court held that

> a fictionalized situs for intangible property sometimes has been invoked to avoid multiple taxation of ownership, [but] there is nothing talismanic about the concepts of "business situs" or "commercial domicile" that automatically renders those concepts applicable when taxation of income from intangibles is at issue. . . . The Court also has recognized that "the reason for a single place of taxation no longer obtains" when the taxpayer's activities with respect to the intangible property involve relations with more than one jurisdiction. [*Id*. at 445, quoting *Curry v McCanless*, 307 US 357, 367; 59 S Ct 900; 83 L Ed 1339 (1939).]

22

Similarly, in *Exxon Corp*, 447 US 207, the United States Supreme Court affirmed Wisconsin's ability to proportionally tax the entirety of Exxon Mobil's profit. Exxon was "a vertically integrated petroleum company" headquartered in Texas. *Id*. at 210-211. At the relevant time, the company was internally organized into various subparts, although these subparts were not separate subsidiaries; the subparts competed with each other for internal investment as well as with other companies operating in their respective fields. *Id*. at 212. This meant, for instance, that "[t]here was no requirement that [Exxon's] crude oil go to its own refineries or that the refined products sold through marketing be produced from [Exxon's] crude oil." *Id*. "Marketing" was the only activity carried out in Wisconsin.

Despite Exxon's limited business in Wisconsin, the United States Supreme Court held that Wisconsin was entitled to include Exxon's *total income* in the business tax base because it "has long been settled that 'the entire net income of a corporation, generated by interstate as well as intrastate activities, may be fairly apportioned among the States for tax purposes by formulas utilizing in-state aspects of interstate affairs.' " *Id*. at 219 (citation omitted). This is because "[t]he 'linchpin of apportionability' . . . is the 'unitary-business principle.' " *Id*. at 223, quoting *Mobil Oil Corp*, 445 US at 439. That is, "[i]f a company is a unitary business, then a State may apply an apportionment formula to the taxpayer's total income in order to obtain a 'rough approximation' of the corporate income that is 'reasonably related to the activities conducted within the taxing State.' " *Exxon Corp*, 447 US at 223 (citation omitted).

To exclude income from the formula, "the company must prove that 'the income was earned in the course of activities unrelated to' " the unitary business engaged in within the state. *Id*. (citation omitted). Despite Exxon's internal divisions, "it [was] nonetheless

23

true that this case involve[d] a highly integrated business which benefit[ed] from an umbrella of centralized management and controlled interaction." *Id*. at 224. The mere fact that the business could distill certain income streams to geographical locations did "not alter the fact that such income [was] part of the unitary business of the interstate enterprise and [was] subject to fair apportionment among all States to which there [was] a sufficient nexus with the interstate activities of the business." *Id*. at 230.

In *ASARCO Inc v Idaho State Tax Comm*, 458 US 307, 309-310, 330; 102 S Ct 3103; 73 L Ed 2d 787 (1982), the United States Supreme Court held that an Idaho apportionment tax as applied to a mining company's subsidiaries violated the Due Process Clause. ASARCO was headquartered in New York, incorporated in New Jersey, and operated a silver mine in Idaho. *Id*. at 309. It had eleven subsidiaries. Notably, six of the subsidiaries were part of ASARCO's unitary business and thus were included in the Idaho tax calculation without contest by ASARCO. *Id*. at 312-313. The question before the Court was whether Idaho could include dividends, interest, and stock-sale profits from the remaining five out-of-state subsidiaries within its business tax calculation. The United States Supreme Court, overturning the Idaho Supreme Court, found that the profits of the five subsidiaries could not be included in the apportionment calculation. *Id*. at 315.

Unlike other cases, ASARCO offered evidence that the five subsidiaries did not contribute to the unitary business. *Id*. at 320-324.[11] The United States Supreme Court

---

[11] Specifically, with respect to one subsidiary, even though ASARCO owned 51.5% of the stock, it entered into a management agreement with the other four shareholders greatly diluting its ability to control any of the corporate decisions of that company. *Id*. at 321-322. Further, "[a]lthough ASARCO ha[d] the control potential to manage [another subsidiary due to 52.7% stock ownership], no claim [was] made that it ha[d] done so." *Id*. at 323. Two

refused to hold that ASARCO's "corporate purpose" (mining) was sufficient to create a unitary business between a parent and its subsidiaries. *Id*. at 326-327 (emphasis omitted). Rather, because it was "plain that the five dividend-paying subsidiaries 'add to the riches' of ASARCO" but "are 'discrete business enterprise[s]' that—in 'any business or economic sense'—have 'nothing to do with the activities' of ASARCO in Idaho," there was "no 'rational relationship between the [dividend] income attributed to the State and the intrastate values of the enterprise.' " *Id*. at 328 (citations omitted).

In *Container Corp*, 463 US at 162-163, a Delaware corporation headquartered in Illinois challenged California's franchise tax targeting income that was derived, in part, from subsidiaries operating in other countries. After finding sufficient control between the Illinois parent company and its subsidiaries to consider them a unitary business, *id*. at 179-180, the United States Supreme Court held that California's three-factor business tax base calculation (comparing California sales, payroll, and property to companywide sales, payroll, and property) did not unduly inflate profits to increase the taxable base attributable to California, *id*. at 181-182. The Court rejected Container Corp's proposal to discount payroll because the foreign payrolls were substantially lower as "precisely the sort of formal geographical accounting whose basic theoretical weaknesses justify resort to formula apportionment in the first place." *Id*. at 181. The Court also held that the 14%

---

other subsidiaries in which ASARCO held a minority ownership position operated entirely independently of ASARCO and did not "seek[] direction or approval from ASARCO on operational or other management decisions." *Id*. at 323-324. The same was true of the final subsidiary, which was majority-owned by foreign nationals and "operate[d] independently of" ASARCO. *Id*. at 324 (quotation marks and citation omitted).

increase in tax liability the formula imposed was "a far cry from the more than 250% difference which led [the Court] to strike down the state tax in *Hans Rees' Sons, Inc.*, and a figure certainly within the substantial margin of error inherent in any method of attributing income among the components of a unitary business." *Id*. at 184.

Turning to Michigan, in *Trinova I*, 433 Mich at 151-152, 167, we upheld Michigan's now-repealed value added tax. Trinova in that case sought an alternative accounting "on the ground that its apportioned 1980 compensation was approximately forty times greater than its actual Michigan compensation, and that its apportioned depreciation was approximately one thousand times greater than its actual Michigan depreciation." *Id*. at 163. *Trinova I* held:

> [T]he test for fair apportionment is not whether a formula results in inadequate or even inaccurate apportionment. The test is whether the use of a particular method of apportionment results in business activity being attributed to this state which is "out of all appropriate proportions" to the taxpayer's intrastate business activity, or has "led to a grossly distorted result." [*Id*. at 160.]

The Court further noted that "the constitution requires neither a perfect formula nor a perfect apportionment." *Id*. at 162. The Court thus held that the resulting apportionment was not "out of all appropriate proportion" to the business conducted in Michigan. *Id*. at 163-164.

In *Trinova Corp v Mich Dep't of Treasury*, 498 US 358, 379; 111 S Ct 818; 112 L Ed 2d 884 (1991) (*Trinova II*), the United States Supreme Court affirmed this Court's decision in *Trinova I*, holding that the factors Trinova sought to exclude from the apportionment formula were "with limited exception, out-of-state expenses." Nevertheless, "[t]he same factors that prevent determination of the geographic location

26

where income is generated, factors such as functional integration, centralization of management, and economies of scale, make it impossible to determine the location of value added with exact precision." *Id*. *Trinova II* rejected Trinova's claim that the formula at issue lacked external fairness because Trinova failed to show that there was "no rational relationship between the tax base measure attributed to the State and the contribution of Michigan business activity to the entire value added process." *Id*. at 380. Thus, the United States Supreme Court rejected Trinova's efforts to exclude "sales" as a factor from the tax apportionment formula on the basis that while Michigan sales constituted 26.5892% of Trinova's total sales, its Michigan payroll constituted only 0.2328% of its companywide payroll total and its Michigan property constituted only 0.0930% of its companywide property total. *Id*. at 381. Inclusion of all three factors resulted in a total Michigan apportionment rate of 8.9717%, as opposed to the 0.1629% proposed by Trinova in its two-factor analysis. *Id*.

Most recently, the Maine Supreme Judicial Court addressed a situation similar to this case. In *State Tax Assessor v Kraft Foods Group, Inc*, 235 A3d 837, 841; 2020 ME 81 (2020), the court rejected Kraft's argument that it was entitled to use an alternative apportionment calculation for its corporate income tax filing because of a giant one-time spike in income derived from the $3.7 billion sale of its North American frozen pizza business to Nestle. Kraft failed to include the gross receipts from the frozen pizza transaction in its subsequent Maine income tax return based on an assertion that the "income was not taxable by Maine under either the Maine Constitution or the United States Constitution." *Id*. Like Michigan, Maine also operated using a single "sales factor" for its unitary business tax apportionment calculation. *Id*. at 843. And like Vectren in this case,

27

Kraft argued that the multibillion-dollar frozen pizza business sale could not " 'be fairly represented by a single-sales factor formula determined in principal part by gross receipts from Kraft's day-to-day food product sales.' " *Id*. at 845.

The court rejected Kraft's argument, noting that "the sales factor is designed to attribute a taxpayer's income to the jurisdictions in which its goods and services are consumed." *Id*. (cleaned up). The court further noted that "[t]he fact that Kraft's net income in 2010 was much greater than in previous years does not support the conclusion that the sales factor itself does not fairly represent the extent of the taxpayer's business activity in Maine." *Id*. at 844 (cleaned up). "The question is not whether the sales factor fairly represents the sales income; the question is whether the sales factor fairly represents the extent of Kraft's business activity in Maine." *Id*. at 845. As a result, the apportioned tax was upheld. *Id*. at 853.

## III. ANALYSIS

A business's income from the sale of assets is apportionable for business tax purposes even if the sale occurred in another state so long as the tax is assessed in a proportionate manner. Moreover, the United States Supreme Court has clearly established that a party challenging a business tax on the basis that it is disproportionate has a heavy burden of showing by clear and cogent evidence that the apportionment formula attributed income "out of all appropriate proportion" to the business activity in Michigan or that it led to a "grossly distorted" result. Vectren is unable to meet that burden—even construing the facts in the light most favorable to the company.

A.  THE INCOME AT ISSUE IS APPORTIONABLE UNDER THE STATUTE AND CONSTITUTION

The first question in any multistate business tax apportionment dispute is whether the taxed entity is a unitary business, which then triggers the ability for states to tax under their individual business/corporate tax apportionment statutes.  There is no dispute that ML, at the time it filed its return in 2011, was a unitary business.  Nor is there any debate that ML had a substantial nexus with Michigan given its work in the state both with Consumers Energy and Enbridge.  Therefore, the first task for this Court is to determine whether the ML-to-Vectren asset-sale income must be included in the tax base and thus is subject to apportionment.  If the sale-of-business income is not apportionable and cannot be included in the tax base, that would prevent *any* formula—statutory or alternative—from taxing the asset-sale income.

1.  THE CONTESTED INCOME IS STATUTORILY APPORTIONABLE

In order to determine whether the asset-sale income is apportionable, we must first determine whether the statute allows for the sale price of ML to be included in the tax base portion of the formula.  ML chose to treat the sale of its business to Vectren as a sale of assets under 26 USC 338(h)(10).  As a result, the sale of the business included both tangible and intangible assets.  The MBTA imposed a "business income tax on every taxpayer with business activity within this state" unless exempted by federal law (which is not relevant to this appeal).  MCL 208.1201(1).  As previously noted, the tax liability owed by a unitary business is calculated by multiplying the tax base and the sales factor.

ML transferred "legal [and] equitable title" to its tangible and intangible property to Vectren "with the object of gain, benefit, or advantage . . . to the taxpayer or to others . . . ."

29

MCL 208.1105(1). This constituted "business activity" under MCL 208.1105(1). Further, as an S corporation, the sale to Vectren was income "attributable to business activity of the . . . S corporation and separately reported to the partners or shareholders." MCL 208.1105(2). Based upon these definitions, it is undeniable that the ML-to-Vectren asset sale falls squarely within the categories of "business activity" and "business income" defined by the MBTA. Business income must be included in the tax base of the apportionment formula. MCL 208.1201(2).

Next, to calculate the sales factor, ML's total sales in Michigan during the tax year must be compared to ML's total sales "everywhere" during the tax year. MCL 208.1303(1). For the sales-factor calculation, "sales" is defined as "stock in trade," property that can be inventoried, and services sold. MCL 208.1115(1)(a) and (b). It does not include the sale of a company. Therefore, while the asset-sale income generated from the sale of ML to Vectren is "business income" and includable in the tax base, it is inappropriate to include the asset sale in either the sales-factor numerator or denominator. Justice ZAHRA's dissent spends significant time discussing the location of the physical assets of the company and payroll. If these were included, it argues, the apportionment would be substantially lower. This is perfectly true, and perhaps a three-factor formula would result in a lower tax in this instance. But the Legislature chose a single-factor formula that is presumed valid and has been repeatedly upheld by the United States Supreme Court. See, e.g., *Underwood Typewriter Co*, 254 US at 120 (applying a single-factor property formula); *Moorman Mfg Co*, 437 US at 273 ("[W]e have repeatedly held that a single-factor formula is presumptively valid."). Our role is not to act as seven super-

legislators and overrule the Legislature's policy decisions.[12]  Because Vectren fails to show that the formula either was improperly calculated or unreasonably reflects the business transacted in the taxing year at issue, it must be upheld.

### 2.  THERE ARE NO SPECIAL CONSTITUTIONAL PROTECTIONS THAT PROHIBIT INCLUDING BUSINESS SALE INCOME IN NET INCOME

When a company "elect[s] to attack the tax base rather than the formula," it "substantially narrows the issues before us." *Mobil Oil Corp*, 445 US at 434.  Given ML's decision to attack the tax base in the MBTA's apportionment formula, the next question the Court must answer is "whether there is something about the character of income . . . that precludes, as a constitutional matter, state taxation of that income by the apportionment method." *Id*. at 435.  We are bound by the weight of precedent and find no reason why ML's business-asset-sale income is not part of the "entire net income of a corporation, generated by interstate as well as intrastate activities, [which] may be fairly apportioned among the States for tax purposes by formulas utilizing in-state aspects of interstate affairs." *Exxon Corp*, 447 US at 219 (quotation marks and citation omitted).

Vectren and Justice ZAHRA's dissent argue that ML's sale price should not be included in the tax base because the value is attributable to tangible assets, intangible assets, and the goodwill accumulated primarily outside of Michigan.  But the "linchpin of apportionability in the field of state income taxation is the unitary-business principle."

---

[12] Justice ZAHRA's dissent also goes into extensive detail about the history of the company's ownership, the location of the company's headquarters, the location of the out-of-state sale, and the location of the company's workers and equipment.  These are all factors that exist in every unitary business taxation dispute.  They are irrelevant to the assessment of tax liability because a unitary business is just that—unitary.  The different parts and pieces are not picked apart for business taxation purposes.

*Mobil Oil Corp*, 445 US at 439. To show that income is earned outside the stream of the unitary business, ML must show that the challenged income "was earned in the course of activities *unrelated to*" the business activities it carried on in Michigan. *Id*. (emphasis added). A lone contention that the income source is from out of state does not suffice. See *id*. ("*Bass, Ratcliff & Gretton* forecloses the contention that the foreign source of the . . . income alone suffices for this purpose.").

Like *Mobil Oil Corp*, the United States Supreme Court in *Exxon Corp* affirmed a Wisconsin statute apportioning income from the *entirety* of the oil company's operations. It did so even though only one "functional department" operated within the state, "[e]ach functional department was organized as a separate unit operating independently of the other operating segments," the "departments were treated as separate investment centers by the company, and a profit was determined for each functional department." *Exxon Corp*, 447 US at 212. Despite these internal separations, Exxon, as a unitary business, did "not carr[y] its burden of showing that its functional departments are 'discrete business enterprises' whose income is beyond the apportionment statute of the State." *Id*. at 224; see also *Ford Motor Co*, 308 US at 336.

Further, *Mobil Oil Corp* affirmed that taxation of intangible assets such as stock ownership and dividend income was appropriate, even if those intangible assets did not directly involve the taxing state. The Court noted that " 'the reason for a single place of taxation no longer obtains' when the taxpayer's activities with respect to the intangible property involve relations with more than one jurisdiction." *Mobil Oil Corp*, 445 US at 445, quoting *Curry*, 307 US at 367.

32

*Kraft Foods Group*, a Maine decision, is almost directly on point and engaged in the same analysis that we must do here. There, as here, the taxpayer argued that Maine's statutory single sales-factor apportionment formula could not fairly impute tax liability to Kraft in the face of an " 'unusual, non-recurring, and extraordinary' " one-time gain. *Kraft Foods Group*, 235 A3d at 845. The Maine court noted that even "assuming for the sake of argument that the income from the [frozen pizza] sale was generated primarily by unitary business activity that took place outside of Maine, . . . that still would not mean that the sales factor does not fairly represent Kraft's unitary business activity within Maine." *Id*. at 846 (citation omitted). The identical analysis applies to ML/Vectren in Michigan. There is no evidence in the current record that demonstrates that the MBTA apportionment formula fails to represent ML's full business activity in Michigan at the time of the sale.

While taxpayers have successfully challenged business tax formulas as disproportionate, the record here stands in stark contrast to those cases. In *ASARCO*, the appellant set forth clear and cogent evidence that the income from five subsidiaries it sought to exclude from its Idaho tax base was entirely generated in a different jurisdiction,[13] was entirely *unrelated* to its primary and unitary business, and had nothing to do with ASARCO's activities in Idaho. *ASARCO*, 458 US at 316, 321-325, 327.

Similarly, *Norfolk* held that the railroad appellant provided clear and cogent evidence that the apportioned tax base was incorrect when the railroad provided proof that the "specialized equipment" used in a majority of the rail system (1) was separate and

_____

[13] Indeed, as noted in that opinion, there were six subsidiaries whose status as part of the "unitary business" of ASARCO was *not challenged* despite their location outside the taxing state. *ASARCO*, 458 US at 313.

distinct, and not interchangeable with the railcars leased in the taxing state, and (2) almost never entered the state. *Norfolk*, 390 US at 319, 321-322.

What was true in *ASARCO* and *Norfolk* cannot be said for ML/Vectren. There is no evidence that ML's multistate business activities were carried out by independent subsidiaries or even autonomous internal divisions. Vectren does not contend that the activities ML engaged in outside of Michigan to build its tangible assets, intangible assets, and goodwill were separate and distinct types of business wholly unrelated to the activities it engaged in within Michigan. Nor does Vectren eschew control over the company decisions made anywhere in the 24 states in which ML operated. Indeed, in its own briefing, ML notes that the success of the company was derived "from the family's labor."

Justice ZAHRA's dissent vehemently disagrees with the contention that the sale of assets outside of Michigan could contribute to the tax base for Michigan taxation. Its argument boils down to the same points that were completely rejected in *Mobil Oil Corp* and *Exxon Corp*—that the alleged out-of-state nature of the activities which generated the income means that Michigan cannot include it in the tax base. This argument has been foreclosed repeatedly by the United States Supreme Court, and we are bound to apply the caselaw. See, e.g., *Underwood Typewriter Co*, 254 US at 120-121 (allowing Connecticut to tax sales made entirely out of state simply because "[t]he profits of the corporation were largely earned by a series of transactions beginning with manufacture in Connecticut and ending with sale in other states"); *Bass, Ratcliff & Gretton*, 266 US at 282 (allowing New York to include foreign sales in the taxable values because "the State was justified in attributing to New York a just proportion of the profits earned by the Company from such unitary business [carried on out of state]"); *Ford Motor Co*, 308 US at 334 (affirming a

34

Texas statute that allocated capital "as a base for taxation . . . in excess of $23,000,000" despite "[t]he value of all assets located in Texas [being] somewhat over $3,000,000"); *Mobil Oil Corp*, 445 US at 441, 445-446 (finding that "dividends from legally separate entities works no change in the underlying economic realities of a unitary business, and accordingly it ought not to affect the apportionability of income the parent receives"); *Exxon Corp*, 447 US at 212-213 (permitting Wisconsin to tax the income of Exxon's exploration, production, and refining operations despite Exxon having no such operations in Wisconsin; the only activity carried out in Wisconsin was marketing). Of particular note, in *Butler Bros*, California was permitted to tax an Illinois company's profits from warehouses operating out of state. *Butler Bros*, 315 US at 508. The assets and sales at issue were definitively located out of state, and it was the profit on those—not the California sales—which drove the company's overall profits. *Id*. at 506. Nevertheless, California was allowed to apply its apportionment formula to the total profit. These cases definitively show that the proper legal test is not where the assets are physically located or where the company is domiciled for intangible assets but rather whether those assets play a part in the unitary business operations that subject the corporation to taxation in the taxing state in the first place.

### 3. THE INTANGIBLE ASSETS ARE TAXABLE

Vectren additionally argues that ML's value was tied to its trade name, goodwill, and customer relationships, all intangible assets unrelated to Michigan. But this argument also misses the mark. As an initial matter, the method for measuring intangible asset value uses a forward-looking analysis. See Puca & Zyla, *The Intangible Valuation Renaissance:*

35

*Five Methods*, Enterprising Investor (January 11, 2019) <https://blogs.cfainstitute.org/investor/2019/01/11/a-renaissance-in-intangible-valuation-five-methods> (accessed June 27, 2023) [https://perma.cc/9QQ2-YJ52] (describing the five most common "income approach" intangible asset valuation methods, which use forward-looking metrics).[14] While past performance is an important part of the evaluation of future earning potential, it is not the sole consideration, as Vectren seems to suggest.

As an example, in the era of digital retail, a number of prominent retail establishments that once posted massive sales and profits have gone bankrupt or shrunk to shadows of their former selves because of changing technology and shopping patterns. A business interested in purchasing the trade name of such a retailer would consider both its past performance *and* its future potential for rebirth. To argue—as Vectren does—that only those past actions out of state should be included in the intangible valuation is belied by the actual valuation process used when it purchased ML, the general rules of accounting, and common sense.

This is especially true when Vectren asks us to consider the entire 52-year history of ML evenly and to focus on the decades in which it did no business in Michigan. It is undoubtedly true that the company's founder and his children worked hard to build the company over that time. But where a company operated or whether it was reliable 45 years before its sale does not matter as much as the company's scope and reliability immediately

---

[14] Even the report that KPMG prepared for Vectren in anticipation of the sale described the "Income Approach" to valuation as being "predicated upon the value of the *future cash flows that an asset will generate over its economic life*" and noted that the firm used the income approach to evaluate ML's trade name, customer relationships, and backlog.

preceding the sale.[15]  Indeed, the "Offering Memorandum," titled "Project Cadillac,"[16] that

was prepared to help ML attract buyers only provides data back to 2007.

Further, the record before us shows connections between Michigan and ML both

before the sale and as a potential future growth market.  The following is a nonexhaustive

summary of relevant evidence in the record submitted to this Court:

- The contract to clean up the Enbridge oil spill was ML's "largest single contract ever performed in Michigan," entered into in 2010 and continued throughout 2012.

- In the Vectren acquisition presentation, Consumers Energy, a Michigan utility company, was listed as a significant customer for ML, along with Northern Natural, Enbridge Energy, and Minnesota Pipe Line, which all operated in Michigan.  The importance of Consumers Energy was reiterated during the deposition of ML's former co-owner.

- The Vectren acquisition presentation identified Michigan as part of "[ML's] current transmission territory."

- An audit report of the 2010 schedule of completed contracts included two recently completed "important" ML projects in Michigan: (1) "Marquette BL Replacement Project" and (2) "W Oakland and DeWitt Pipeline Project."

---

[15] Moreover, the intangible assets would have logically increased in value on the basis of ML's expansion into new markets.  Thus, evidence of prior inactivity in Michigan might actually make Michigan *more* valuable to ML, not less.  ML's value increased after its extensive work in Michigan, and the contract here—beyond adding $70 million in cash flow—certainly helped generate more work both inside and outside the state.  The Michigan work demonstrated the company's ability to work in emergency conditions and in all types of weather—strengths that it included in its Offering Memorandum.  Further, all income—whether based on sales of intangible assets or direct profit from standard business practices—relies, in part, on the past decisions of ML's leadership.

[16] Notably, this title could be either an homage to the Detroit-based auto company or the French explorer Antoine de la Mothe Cadillac, who founded Fort Pontchartrain du Détroit. Either usage shows the importance of Michigan in marketing the sale of the business.

- The "Project Cadillac" memorandum identified its "[k]ey customers" as including Enbridge, Xcel Energy, Koch Pipeline Company LP, BP, and Northern Natural Gas. These companies maintained a significant presence in Michigan.

- The "Project Cadillac" memorandum specified that ML "also has substantial capabilities in other regions with an emphasis on expansion . . . [in] areas in the Great Lakes region," that ML's Illinois office was acting as a "beachhead" for obtaining work in Michigan, and that "[t]he Company plans to continue this strategy and is evaluating opening two additional locations that would better position it for work in the Great Lakes region . . . ."

- The "Project Cadillac" memorandum reiterated the significant natural gas pipeline construction between Canada and the Great Lakes region.

- The "Project Cadillac" memorandum stated that the "Antrim Shale formations are right in the Company's geographic sweet spot" and included a map showing that the Antrim Shale formations are, almost entirely, within the state of Michigan.

- The "Project Cadillac" memorandum specified that a pipe installation project in Michigan for "Customer C" in 2009 was one of ML's "noteworthy pipeline construction projects." This same document noted that "Customer C" accounted for 18.3% of ML's overall revenue in 2009—the third highest percentage of any customer in that year.

The evidence shows that ML had a business presence in Michigan for many years before the sale to Vectren. The record shows that Michigan remained a target for ML given ML's existing customers and planned market growth at the time of the sale.

Justice ZAHRA's dissent argues that the ML marketing documents are virtually useless for our consideration because companies exaggerate information to make their assets appear more versatile or useful in generating profits. Even assuming that is the case, the statements on asset versatility nevertheless play a role in the valuation of an asset.[17]

---

[17] Indeed, if statements by a seller on asset utility were revealed to be untrue, a buyer could have a cause of action against the seller for fraud in the inducement.

Further, we have no reason to believe that ML was dishonestly promoting itself nor any reason to disbelieve ML's corporate documents stating that Michigan would play a potential role in its growth. Justice ZAHRA's dissent's observation that, years later, the potential growth in Michigan did not occur is hindsight-quarterbacking. The potential utility of the asset to the buyer is a key piece of the value of that asset, regardless of whether that value is eventually realized.[18]

Like the Maine Supreme Judicial Court in *Kraft*, we fail to see any meaningful distinction between income from an asset sale and income from the regular course of business that would make it constitutionally unapportionable. The fact that some of the sale price was related to intangible assets does nothing to change that analysis. In *Kraft*, the brands included in the sale to Nestle included Tombstone Pizza Company, Jack's Frozen Pizza, DiGiorno, and California Pizza Kitchen's frozen pizza division. *Kraft*, 235 A3d at 840-841. Certainly, a substantial part of the value in that sale was the trade names and goodwill associated with some of the largest frozen pizza brands in America.[19] And yet the full value of the one-time multibillion-dollar frozen pizza sale was properly included in Maine's business apportionment tax formula. As stated in *Kraft*, the "fact that

---

[18] Justice ZAHRA's dissent uses a distorted food truck analogy involving a food truck purchased in Michigan that the seller claims can be driven to New York, California, or Florida to illustrate its point, but this analogy misses the mark. A food truck, operating solely within Michigan, would not be subject to taxation for an asset sale in a state in which it did no business because a food truck is fundamentally intrastate in nature, which is vastly different from the interstate conglomerate we deal with here.

[19] See Conway, *Market Share of the Leading Frozen Pizza Brands in the United States in 2017*, Statista (January 2, 2023) <https://www.statista.com/statistics/586978/market-share-frozen-pizza-brands-in-the-united-states/> (accessed June 28, 2023) [https://perma.cc/8DJH-KVP4].

Kraft's net income in 2010 was much greater than in previous years does not support the conclusion that the sales factor itself does not fairly represent the extent of the taxpayer's business activity in Maine." *Id*. at 844 (cleaned up). The facts here require the same result as to ML/Vectren under the MBTA.

## B. THE APPORTIONMENT FORMULA DOES NOT VIOLATE THE CONSTITUTION

Next, we must address whether Vectren has shown by clear and cogent evidence that the sales factor, as applied, appropriately captured the business activity of ML in Michigan during the 2011 short year. The formula is "rebuttably presumed to fairly represent the business activity attributed to the taxpayer in this state, . . . unless it can be demonstrated that the business activity attributed to the taxpayer in this state is out of all appropriate proportion to the actual business activity transacted in this state and leads to a grossly distorted result or would operate unconstitutionally to tax the extraterritorial activity of the taxpayer." MCL 208.1309(3); see also *Moorman Mfg Co*, 437 US at 273 ("[W]e have repeatedly held that a single-factor formula is presumptively valid."). In the present case, even viewing the evidence in the light most favorable to it, plaintiff has failed to show by clear and cogent evidence that the taxation formula includes income that is disproportionate to business transacted in Michigan or that the result is "grossly distorted." *Id*. at 274; *Container Corp*, 463 US at 170.

To satisfy the United States Constitution's Due Process Clause, a state's taxation scheme must show (1) "a 'minimal connection' or 'nexus' between the interstate activities and the taxing State" and (2) " 'a rational relationship between the income attributed to the State and the intrastate values of the enterprise.' " *Exxon Corp*, 447 US at 219-220 (citation

40

omitted). A tax satisfies the Commerce Clause when "[1] the tax is applied to an activity with a substantial nexus with the taxing State, [2] is fairly apportioned, [3] does not discriminate against interstate commerce, and [4] is fairly related to the services provided by the State." *Amerada Hess Corp v Dir, Div of Taxation, New Jersey Dep't of Treasury*, 490 US 66, 72; 109 S Ct 1617; 104 L Ed 2d 58 (1989) (quotation marks and citation omitted).[20] The Due Process and Commerce Clause analyses largely overlap. The United States Supreme Court has, for instance, often considered the two tests as being essentially the same. See *Container Corp*, 463 US at 169 ("Such an apportionment formula must, under both the Due Process and Commerce Clauses, be fair.").

Fairness has been broken into two components, known as internal and external consistency. Internal consistency requires that if the formula was "applied by every jurisdiction, it would result in no more than all of the unitary business income being taxed." *Id*. External consistency means that "the factor or factors used in the apportionment formula must actually reflect a reasonable sense of how income is generated. The Constitution does not 'invalidate an apportionment formula whenever it *may* result in taxation of some income that did not have its source in the taxing State." *Id*. at 169-170 (cleaned up).

---

[20] A "substantial nexus" is also not a particularly high burden. In *Amerada*, the United States Supreme Court held that there "can be no doubt that New Jersey has 'a substantial nexus' with the activities that generate appellants' 'entire net income,' including oil production occurring entirely outside the State. Each appellant's New Jersey operations are part of an integrated 'unitary business,' which includes the appellant's crude-oil production." *Amerada*, 490 US at 73 (citation omitted).

Here, the parties do not contest that ML has a substantial nexus with Michigan. ML agrees that it owes at least "*some* Michigan tax" but disputes the amount and argues that application of the statutory formula results in a "grossly distorted" tax liability when compared to its actual business in Michigan. ML set forth the total amount of its sales and its sales in Michigan from 2001 (approximately $19.6 million in total sales with $0 in Michigan) compared to 2010 (approximately $110.4 million in total sales with approximately $43.4 million in Michigan). In the 2011 short year, apparently because the Enbridge contract was ongoing while the winter months generally meant decreased workflow for the company, almost 70% of the company's sales were in Michigan. This led to the 69.96% sales-factor calculation at issue here.

ML does not contest the fact that 70% of its business in the relevant tax year was in Michigan. Rather, it contends that before the 2011 short year, Michigan represented a smaller share of its overall business and that 2011 sales do not reasonably indicate "income attributed to the state" but "is in fact out of all appropriate proportions to the business transacted in [the] State . . . ." *Container Corp*, 463 US at 170 (quotation marks and citation omitted). The extensive caselaw set forth in this opinion says otherwise.

### 1. THE MBTA TEST DOES NOT VIOLATE DUE PROCESS

#### a. THE MBTA TEST IS INTERNALLY CONSISTENT

To begin, we must determine whether the MBTA apportionment formula is internally consistent—that is, if every state employed Michigan's test under the MBTA, would there be double taxation? The answer is simple: no. The MBTA imposed a sales-only formula that attributed 70% of ML's business activity—including the asset-sale income—to Michigan for the 2011 short year. If every other state employed Michigan's

test, the other jurisdictions in which ML operated would both (1) apportion the sale income and (2) divvy up the remaining 30% of sales and apply the same formula to the same tax base to calculate their apportioned share. See, e.g., *Trinova I*, 433 Mich at 158 ("In this case, the apportionment provisions of the single business tax are internally consistent because no multiple taxation would result if every state were to adopt the act. The business activity of any unitary business would be apportioned by each taxing jurisdiction using the identical method."). This is the benchmark of internal consistency, and it has been met.

Justice ZAHRA's dissent states that "it is very likely that the income derived from ML's sale was subject to double taxation: once in Minnesota as a capital gain or pass-through income to ML's owners and twice in Michigan (and perhaps other states) as an asset sale to Vectren." As support, Justice ZAHRA's dissent cites Vectren's Court of Appeals brief, which states that the shareholders of ML paid federal and state taxes and that ML filed tax returns for the short year in multiple jurisdictions. While the former owners of ML might have paid individual income taxes on the income generated from ML's asset sale, and while ML might have included the capital gains in its short-year tax returns, "the constitutionality of a [Michigan] tax should not depend on the vagaries of [another state's] tax policy." See *Mobil*, 445 US at 444.

In *Mobil*, the plaintiff attempted to exclude dividend income from apportionment by Vermont because it argued that Vermont's tax "subject[ed] interstate business to a burden of duplicative taxation that an intrastate taxpayer would not bear. . . . [The plaintiff] contend[ed] that *any* apportioned tax on its dividends [would] place an undue burden on that specific source of income, because New York, the State of commercial domicile, has the power to tax dividend income without apportionment." *Id*. at 443-444. Vectren and

43

Justice ZAHRA's dissent appear to be making the same argument here: because the income from the asset sale may be taxable as income of the shareholders of an S corporation elsewhere, Michigan may not include it as "business activity." This approach would mean that any S corporation's asset-sale income could be inherently unapportionable because the income is passed through to shareholders outside of Michigan as income and is also income from an asset sale. This is precisely why the constitutionality of Michigan's taxes does not rely on what other states do or do not tax, a principle recognized by the United States Supreme Court.[21]

b. THE MBTA TEST IS EXTERNALLY CONSISTENT

In order for the MBTA apportionment formula to be externally consistent, "the choice of factors used in the formula must actually reflect a reasonable sense of how the business activity is generated." *Id*. (cleaned up). ML generated income by contracting to service pipelines and conducting hazardous material cleanup services. To establish that the MBTA test was externally inconsistent, Vectren had to show by clear and cogent evidence that the ML business activity attributed to Michigan was "in fact out of all

---

[21] See *Moorman*, 437 US at 276-278. The *Moorman* Court rejected the appellant's contention that taxation in Illinois and Iowa that might overlap was unconstitutional because "[i]t is, of course, true that if Iowa had used Illinois' three-factor formula, a risk of duplication in the figures computed by the two States might have been avoided. But the same would be true had Illinois used the Iowa formula." *Id*. at 277. Further, "[t]he only conceivable constitutional basis for invalidating the Iowa statute would be that the Commerce Clause prohibits any overlap in the computation of taxable income by the States. If the Constitution were read to mandate such precision in interstate taxation, the consequences would extend far beyond this particular case. For some risk of duplicative taxation exists whenever the States in which a corporation does business do not follow identical rules for the division of income. Accepting appellant's view of the Constitution, therefore, would require extensive judicial lawmaking." *Id*. at 278.

appropriate proportions to the business transacted in that State or has led to a grossly distorted result." *Container Corp*, 463 US at 170 (cleaned up). It has failed to do so.

Vectren argues that removing the asset sale from the denominator of the sales factor results in a gross distortion of its true tax liability. Including the asset sale in the denominator—which ML did in its tax filings for the 2011 short year—resulted in an apportionment of 14.99%. After Treasury removed the asset sale from the denominator of the sales factor, that percentage increased to 69.96%. This, ML argues, results in a gross distortion of its true tax liability. Justice ZAHRA's dissent goes further and uses a parade of statistics comparing the short-year percentage to historical averages. But the calculation is not a gross distortion because the numbers used by ML and adopted by Justice ZAHRA's dissent are based on a "baseline" that is entirely made up. ML was never entitled to add the asset-sale income to the denominator of the sales factor without first obtaining permission from Treasury to pursue an alternative apportionment. By doing so in the first instance, and seeking forgiveness instead of permission, ML has created an expectation that is devoid of any connection to its real liabilities. Instead, the caselaw we have set forth in this opinion, which includes a century of jurisprudence from the United States Supreme Court, shows that taxing a company's entire taxable base using a proportionality formula that accurately measures sales is appropriate and is not a gross distortion.[22]

---

[22] See *Underwood Typewriter Co*, 254 US at 120 (upholding a 47% allocation based on property ownership in the state of Connecticut, despite 3% of revenue coming from Connecticut); *Bass, Ratcliff & Gretton*, 266 US at 279-280 (affirming a New York apportionment of income to the state despite the entirety of the company's profits being derived from foreign sources); *Ford Motor Co*, 308 US at 336-337 (holding that a tax "may be properly measured by capital wherever located" and that "[t]he weight, in determining the value of the intrastate privilege, given the property beyond the state boundaries is but

45

ML and Justice ZAHRA's dissent further argue that removing the value of the asset sale from the denominator of the sales factor leads to gross distortion because, without it, the sales factor fails to adequately consider how the income was generated. This is nothing more than a gripe about which factors are or are not included in the formula, and it is unpersuasive. Whether a one- or three-factor test is used (or any other number of factors), litigants have consistently unsuccessfully argued exactly what ML argues here—that a different combination is required.[23] Just as the courts in *Moorman*, *Kraft*, *Container Corp*,

a recognition of the very real effect its existence has upon the value of the privilege granted within the taxing state"); *Moorman Mfg Co v Bair*, 254 NW2d 737, 740 (Iowa, 1977) (approving a 22.6% apportionment under a new single-factor analysis despite the fact that the prior three-factor analysis would have resulted in a 14.1% apportionment), aff'd 437 US 267 (1978); *Container Corp*, 463 US at 184 (finding that a 14% discrepancy between the state's apportionment method and the taxpayer's proposed method was "a far cry from the more than 250% difference which led us to strike down the state tax in *Hans Rees' Sons Inc.*, and a figure certainly within *the substantial margin of error inherent in any method of attributing income among the components of a unitary business*") (emphasis added); *Trinova I*, 433 Mich at 158 ("[T]he choice of factors used in the formula must actually reflect a reasonable sense of how the business activity is generated.") (cleaned up), aff'd *Trinova II*, 498 US 358; *Kraft*, 235 A3d at 845-846 (noting that "[t]he question is not whether the sales factor fairly represents the [asset] sale income; the question is whether the sales factor fairly represents the extent of Kraft's business activity in Maine. . . . [E]ven if we were to assume that the sale was 'extraordinary' or 'unusual' . . . that would not support the conclusion that the sales factor does not fairly represent Kraft's unitary business activity in Maine").

[23] Compare *Moorman Mfg Co*, 437 US at 272 (holding that a sales-only single-factor formula did not improperly ignore out-of-state operations that "were responsible for some of the profits generated by sales in Iowa" and did not reach income "not in fact earned within the borders of the taxing State"), and *Kraft*, 235 A3d at 846 ("Even assuming for the sake of argument that the income from the [asset] sale was generated primarily by unitary business activity that took place outside of Maine, and assuming Kraft could prove that, that still would not mean that the sales factor does not fairly represent Kraft's unitary business activity within Maine.") (citation omitted), with *Container Corp*, 463 US at 181 (discussing and rejecting Container Corp's challenge that California's three-factor formula overweighed certain aspects of its business), and *Trinova II*, 498 US at 382 (rejecting a

and *Trinova II* rejected these endless propositions of different proportionality factor combinations, so too do we. Michigan chose a single-factor modifier based upon sales generated within the state. Courts have routinely upheld the use of both a sales-factor modifier and other single-factor modifiers. The same courts have also upheld the end result even when the difference using an alternative modifier would have resulted in a much lower tax bill.

ML made its money by completing contracts for services that were performed in numerous states, including Michigan. These are the "sales" that must be included in the sales-factor calculation under MCL 208.1115(1)(b). The asset sale's valuation—especially when considering intangible assets—is based on ML's ability to complete these service sales skillfully, on time, and within budget. Proportionality taxation formulas that consider a unitary business's overall income or value are designed to provide a measure of intangible considerations when it is otherwise difficult to draw hard lines as to which state is responsible for the intangible value. See, e.g., *Mobil Oil Corp*, 445 US at 438 (noting that centralized business functions arise from the operation of the business as a whole and that it is "misleading to characterize the income of the business as having a single identifiable 'source' "). This is precisely the reason for formula apportionment.

Major Michigan-oriented contracts, like those with "Customer C" and Enbridge, demonstrate that ML's intangible value extends to Michigan. To hold that the sales factor does not adequately represent "the factors related to the generation of that income" makes

---

two-factor alternative apportionment in favor of Michigan's three-factor formula regarding the former value added tax).

47

little sense when viewed alongside *which* factors generated that income—i.e., completing contracts like those at issue here. As described in Part III(A)(3) of this opinion, intangible assets are valued on a forward-looking basis. The evidence provided during litigation shows that Michigan played an important role in ML's geographic portfolio and that the ML growth strategy relied on existing clients, including Consumers, Enbridge, and other companies with a strong Michigan presence.

The nature of ML's business was to contract for building or repairing pipelines. Justice ZAHRA's dissent repeatedly notes that the Enbridge contract was an "emergency"—but that is a red herring. Although it is true that the contract was entered into quickly and the pipeline break posed an ecological and business emergency for Michigan and Enbridge, the contract appears, based on the record before us, to be for exactly what ML did best: repairing and maintaining petrochemical infrastructure (including during cold weather). Providing emergency services was part of ML's unitary business operation. Thus, when ML provided services during the relevant tax year in Michigan, Michigan was entitled to a share of the income generated from its sales in the ordinary course of business and its asset sale during that year. See *Kraft*, 235 A3d at 844. To find otherwise would mean that ML would receive more favorable tax treatment than others who sell goods or services in Michigan just because its unitary business operation provides emergency services. The sales factor is related to Michigan-based considerations and did not unconstitutionally ignore factors relevant to the generation of the asset-sale value.[24]

---

[24] The cases that Justice ZAHRA's dissent cites to show improper apportionment actually demonstrate the opposite or are inapposite. In *JD Adams Mfg Co v Storen*, the "vice of the statute as applied to receipts from interstate sales [was] that the tax include[d] in its

Vectren's other argument that the tax formula leads to grossly distorted results relies inappropriately on *historical* tax liability without a convincing explanation as to why the historical taxes paid by a company are relevant to a different year's tax liability. ML calculated its 2001 to 2010 average Michigan apportionment percentage at 6.782% and argues that the 70% figure is a tenfold increase of the prior 10-year average. Vectren and Justice ZAHRA's dissent rely on *Hans Rees' Sons* for the proposition that historical tax information is a relevant consideration. But this reliance is misplaced.

---

measure, *without apportionment*, receipts derived from activities in interstate commerce[.]" *JD Adams Mfg Co v Storen*, 304 US 307, 311; 58 S Ct 913; 82 L Ed 1365 (1938) (emphasis added). Similarly, in *Gwin, White & Prince Inc v Henneford*, 305 US 434, 439; 59 S Ct 325; 83 L Ed 272 (1939), the Supreme Court found a tax that was "measured by the entire volume of the interstate commerce in which appellant participates, [and] *is not apportioned to its activities within the state*," violated the Commerce Clause because "[i]f [one state] is free to exact such a tax, other states to which the commerce extends may, with equal right, lay a tax similarly measured for the privilege of conducting within their respective territorial limits the activities there which contribute to the service." (Emphasis added.) Thus, the problem in *Henneford* was also that the tax was an *unapportioned* gross receipts tax. The tax here was an apportioned tax. While Justice ZAHRA's dissent disagrees with the factors used at the time to apportion in Michigan, that is a policy matter for the Legislature. *McGoldrick v Berwind-White Coal Mining Co*, 309 US 33; 60 S Ct 388; 84 L Ed 565 (1940), dealt with whether the city's sales tax was a tax on sales made out of state and neither found a Commerce Clause violation nor dealt with an income tax. *Miller Bros Co v Maryland*, 347 US 340; 74 S Ct 535; 98 L Ed 744 (1954), held that the state of Maryland could not compel a business in Delaware to collect taxes on its behalf. This is not the issue before us. *American Trucking Associations, Inc v Scheiner*, 483 US 266; 107 S Ct 2829; 97 L Ed 2d 226 (1987), dealt with a Pennsylvania tax that clearly gave advantageous treatment to Pennsylvania companies. This is also not an issue before us. *Minnesota v Blasius*, 290 US 1; 54 S Ct 34; 78 L Ed 131 (1933), answered the question of how long personal property must be out of the stream of commerce before a state may impose a property tax on it. In sum, none of these cases gets to the operative question we address here. The cases that have addressed the issue in this case have uniformly held that a unitary business's assets are subject to apportioned taxes regardless of their technical situs so long as they contribute to the unitary business at issue.

In *Hans Rees' Sons*, the United States Supreme Court held that "for the [tax] years 1923, 1924, 1925, and 1926, the average income having its source in the manufacturing and tanning operations within the state of North Carolina was 17 per cent." *Hans Rees' Sons*, 283 US at 127 (quotation marks omitted). Further, it "did not in any event exceed 21.7 per cent" during those years. *Id*. at 134. This stood in stark contrast to the tax assessments of 83%, 85%, 66%, and 85% during those years. *Id*. at 128. Although Vectren is correct that the Court in *Hans Rees' Sons* averaged the attributable income, it was not a *historical* average. Rather, the Court examined work performed in the taxing state for the specific multiple tax years *at issue* and concluded that the states incorrectly measured that work. Unlike in *Hans Rees' Sons*, ML does not dispute that work was, in fact, occurring in Michigan during the 2011 short year. Nor does it dispute that 70% of ML's work was occurring in Michigan during that time period. Rather, Vectren argues that ML's prior tax history should inform our decision.

It is true that in 2001 ML conducted no business in Michigan and that for much of the next 10 years it conducted small portions of its total business in Michigan. However, the chart Vectren provided to support its claim that it should pay a lower 2011 tax given its minimal work in Michigan in prior years actually establishes the opposite conclusion. The chart shows exponential growth in ML's Michigan sales between 2007[25] and 2010, increasing from $957,516 (approximately 1% of overall sales) to $43,352,830

---

[25] 2007 is the first year ML approached $100 million in total sales. Comparing a $110 million company at the time of sale (2010 to 2011) to a $19.6 million company (2001) is not helpful to our analysis. 2007 was also the first year that the "Project Cadillac" memorandum cited ML-specific data with respect to its financial reporting.

(approximately 40% of overall sales). Neither the chart nor any of the evidence provided by ML shows any reason to believe that ML did any less business in Michigan in calendar year 2011 than it did in 2010.

In rejecting the application of proportionality formulas and finding for the taxpayers in *Hans Rees' Sons* and *Norfolk*, the United States Supreme Court relied on evidence clearly displaying that the actual income attributable to the taxing states during the *relevant* years was substantially lower than what the statutory formulas attributed to those states. Contrastingly, Vectren has not challenged Treasury's tabulation of the amount of business conducted in Michigan in the relevant tax year. Instead, Vectren relies on a faulty assumption that past taxes dictate future taxes under the MBTA. Tax liability is a snapshot of the business transacted during a tax year, not a historical analysis.

The tax year is "the calendar year, or the fiscal year ending during the calendar year, *upon the basis of which the tax base of a taxpayer is computed* under this act. If a return is made for a fractional part of a year, *tax year means the period for which the return is made*." MCL 208.1117(4) (emphasis added). If ML had done zero business in Michigan one year and 80% of its business in Michigan the next, the United States Constitution would not offer protection so that ML could avoid paying its proportional share of tax liability. That is no less the case when ML jumped from a 40% sales-in-Michigan ratio in 2010 to a 70% ratio in the 2011 short year. Similarly, the fact that ML chose to sell its assets in March instead of November—when business may have been more spread across its various jurisdictions—does not dictate a different result. A company's internal business

decisions[26] do not mandate differential tax treatment. See *Kraft*, 235 A3d at 845 ("The question is not whether the sales factor fairly represents the sales income; the question is whether the sales factor fairly represents the extent of Kraft's business activity in Maine.").

In contrast to *Hans Rees' Sons* and *Norfolk*, Vectren has failed to provide clear and cogent evidence proving why or how the sales factor is a grossly disproportionate reflection of the business done *during the tax year at issue* in the state. While Vectren contends that the unique nature of the ML contract with Enbridge created substantial business during the time of year normally considered to be an "off" season and that the sales factor is therefore disproportionate, this argument is unsupported by the evidence presented to this Court, which demonstrated ongoing future growth plans in Michigan as set forth in ML's "Project Cadillac" memorandum. Vectren presents no argument as to why ML's good fortune to make substantial sales during a normally slow time of the year[27] creates a constitutional problem for taxation purposes under the MBTA. Undoubtedly, the high volume of work in Michigan was factored into the sale of its business assets to Vectren. In short, ML was actively providing services in Michigan during the relevant 2011 time period, and Michigan only taxed a proportional amount of ML's income based upon ML's business

---

[26] The record indicates that ML was motivated to sell given one of its owner's health concerns. While this decision is certainly understandable, it does not obviate the constitutional power of the state to tax the business.

[27] Vectren's claim that the ML–Enbridge contract was "unique" in that it created "off-season" work is also belied by the quarterly revenue breakdown in the "Project Cadillac" memorandum, which shows that, although Q1 revenues are *generally* substantially lower than revenues in other quarters, in 2008, Q1 revenues were substantially similar to Q2 revenues and higher than Q4 revenues. Thus, although uncommon, this contract type was certainly not so unheard of or unique that it somehow must be constitutionally differentiated from the rest of ML's revenue stream.

activity in Michigan. Treasury's tax assessment therefore does not violate the Due Process Clause.

### 2. THE MBTA TEST DOES NOT VIOLATE THE COMMERCE CLAUSE

The Commerce Clause requires that a multistate business tax "is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." *Exxon Corp*, 447 US at 227-228 (quotation marks and citation omitted). Here, there is no dispute about the existence of a substantial nexus to Michigan, nor is there any claim that the tax discriminates against interstate commerce. As discussed previously, the tax is fairly apportioned to Michigan given the services ML was providing in Michigan at the time.

Additionally, the tax is related to services provided by the state, including "police and fire protection, the benefit of a trained work force, and the advantages of a civilized society." *Id*. at 228 (quotation marks and citation omitted). ML relied on local union workforces hired from local chapters to do intrastate work, rented most of its equipment intrastate for use on Michigan projects, engaged in highly regulated work constructing and repairing pipelines, and performed hazardous material cleanup related to oil pipelines. The ties between ML's business and the services Michigan provided are clear.

In *Exxon Corp*, the Exxon business division operating in Wisconsin turned no profit during the relevant tax years. *Id*. at 213. Nevertheless, Wisconsin was able to tax the entire net income of the corporation as statutorily apportioned. *Id*. at 213-214. The United States Supreme Court refused to engage in the geographical accounting requested by Exxon. *Id*.

53

at 228-229. The Court held that the Commerce Clause did not "require[] allocation of exploration and production income to the situs State rather than apportionment among the States" because "[a]s was the case with income from intangibles [in *Mobil Oil Corp*], there is nothing 'talismanic' about the concept of situs for income from exploration and production of crude oil and gas." *Id*. at 229.

As in *Exxon Corp* and *Mobil Oil Corp*, this case involves a highly integrated unitary business. Thus, even if we were to attribute the intangible and tangible asset-sale income to out-of-state business activities, "the income [still] bears relation to benefits and privileges conferred by several States. These are the circumstances in which apportionment is ordinarily the accepted method." *Exxon Corp*, 447 US at 229 (quotation marks and citation omitted). Vectren proposes the following alternative calculations: placing the ML-to-Vectren asset-sale proceeds in the denominator (total company sales) of the sales factor, as ML did when it filed its tax return; apportionment of the asset-sale proceeds based on tangible asset location; and attribution of the goodwill portion of the asset sale to the selling shareholders' residence and ML's headquarters. These alternatives are, in essence, requests for a geographical accounting that the United States Supreme Court has rejected time and time again.

Further, Vectren contends that Michigan treats intangible asset sales differently than other states and that commercial domicile is where intangibles *should* be claimed for accounting purposes. However, "the constitutionality of [Michigan's] tax should not depend on the vagaries of [another state's] tax policy." *Mobil Oil Corp*, 445 US at 444. Moreover, although a fictionalized situs for intangible property is sometimes invoked to avoid multiple taxation, "there is nothing talismanic about the concepts of 'business situs'

54

or 'commercial domicile' that automatically renders those concepts applicable when taxation of income from intangibles is at issue." *Id*. at 445. "[T]he reason for a single place of taxation no longer obtains when the taxpayer's activities with respect to the intangible property involve relations with more than one jurisdiction." *Id*. (quotation marks and citation omitted).

ML has presented no evidence to support the conclusion that the Commerce Clause requires Michigan to segregate the intangible asset values. This is especially true when, as explained in Part III(A)(3) of this opinion, there are ties between Michigan and those values. Given the substantial nexus between ML and Michigan and the fact that Michigan did not wholly tax out-of-state values, the MBTA statutory formula did not violate the Commerce Clause.[28]

## IV. CONCLUSION

We hold that Treasury properly included the income from the ML-to-Vectren asset sale in the tax base apportionment formula under the MBTA. Neither the Due Process

---

[28] Because we find that Treasury acted within its taxing power, we need not decide whether it was appropriate for the Court of Appeals to remand this case to the Court of Claims "with directions *to determine an appropriate alternative* apportionment method if the parties are unable to agree on one." *Vectren II*, 339 Mich App at 124 (emphasis added). While not necessary to resolving this dispute, we note that the separation of powers enunciated in our state Constitution, Const 1963, art 3, § 2, requires careful consideration of the distinction between an order that finds that another branch lacked authority to take an action and an order requiring specific action when the other branch has been delegated that responsibility. It is for the Legislature to determine procedures for alternative apportionment, which was delegated by statute to Treasury, an agency within the executive branch. Thus, the Legislature entrusted the executive branch with that role, not the courts. Additionally, we do not decide the appropriateness of penalties assessed in this matter because that is a matter for the Court of Claims to resolve on remand.

Clause nor the Commerce Clause has been violated in this matter. We therefore reverse the Court of Appeals holding that Vectren has demonstrated by clear and cogent evidence that the statutory apportionment formula—which Vectren admits correctly denoted the percentage of ML sales in Michigan during the relevant time period—created a grossly disproportionate result when applied to the one-time asset sale. We vacate the remainder of the Court of Appeals opinion and remand this case to the Court of Claims for further proceedings that are consistent with this opinion.

We do not retain jurisdiction.

Elizabeth M. Welch
Richard H. Bernstein
Megan K. Cavanagh
Kyra H. Bolden

STATE OF MICHIGAN

SUPREME COURT

VECTREN INFRASTRUCTURE
SERVICES CORP., successor in interest to
MINNESOTA LIMITED, INC.,

       Plaintiff-Appellee,

v                                 No. 163742

DEPARTMENT OF TREASURY,

       Defendant-Appellant.

_____

ZAHRA, J. (*dissenting*).

      Will Rogers once keenly observed, "The difference between death and taxes is death doesn't get worse every time Congress meets." And, with rare exception, federal, state, and local governments take more of their residents' earnings with each passing year. But nothing in Michigan's tax code or the United States Constitution permits the grossly disproportionate money grab perpetrated on plaintiff by the Michigan Department of Treasury and sanctioned by a majority of this Court today.

      Minnesota Limited, Inc. (ML) built a large corporation with substantial assets, employees, and contracts, almost entirely in Minnesota and other Midwest states. It did minimal business in Michigan. After years of hard work and management, the owners sold the corporation in an asset sale. Now, the Department of Treasury argues that Michigan can be attributed 70% of the company's sale, allowing application of a tax over 10 times larger than standard attributions.[1]

_____

[1] This opinion uses the terms "attribution" and "apportionment" interchangeably to reflect the amount of economic value assigned to and derived from a given jurisdiction.

In essence, the Department claims that the substantial majority of the assets and value attributable to plaintiff's company is located in Michigan. That is a grossly disproportionate tax distribution, which belies the economic value of plaintiff's activities in Michigan. To justify this valuation, the Department cuts into the tax year, carves out a three-month period of time, and attributes tax liability solely on the basis of a single economic factor: direct-to-consumer sales. But valuing direct-to-consumer sales for a highly limited period of time so that the state can tax, most predominantly, the asset sale of an entire out-of-state company creates a major distortion in tax apportionment.

By turning a blind eye to the economic value of plaintiff's operations in the state while applying a highly limited time reference, the Department failed to fairly attribute the tax to plaintiff's activities in Michigan. Instead of the apportionment used, the Department should have taken into account the massive asset sale in Minnesota, whether as part of the calculation of sales, or as part of a three-factor analysis that properly encapsulated the value of out-of-state assets. If the United States Constitution's prohibition on disproportionate taxation of out-of-state activity is to retain viable force, this tax cannot withstand constitutional scrutiny. If the Department's tax apportionment is permitted, this state and others will continue to extend their reach further and further into out-of-state activities; it is hard to see how budget-strained state governments will keep their tax collectors at state boundaries. States will compete for more and more dollars flowing outside their borders. This will come at the cost of state sovereignty and the consistent and predictable administration of interstate commerce.

The majority opinion endorses the Department's tax apportionment. While that may boost this state's coffers in the short term, businesses going forward should remain vigilant when deciding whether and when to invest in Michigan. If done at the wrong time, even minor forays

into Michigan could catch out-of-state corporations in a web of extensive tax liability for overwhelmingly out-of-state activities. Despite having a statutory and constitutional obligation to avoid disproportionate taxation, Michigan tax authorities have proven to be unsympathetic. Without federal court intervention to limit such behavior, more consistent and aggressive tax assessments in this state and others are likely to be issued. Because this result is not permitted by the Constitution, I dissent. I would affirm the unanimous opinion of the Court of Appeals.

## I. FACTUAL BACKGROUND AND RECORD SUPPORT FOR VECTREN'S CLAIMS

This case comes to us on an appeal from cross-motions for summary disposition under MCR 2.116(C)(10).[2] Given that the majority opinion directs the entry of summary disposition in favor of the Department of Treasury, the facts must be viewed in the light most favorable to plaintiff.[3] All reasonable inferences from the record must be taken in favor of plaintiff.[4] While this procedural posture is completely ignored in the majority opinion, it is nonetheless significant.[5]

---

[2] A party may request judgment under the rule if there is "no genuine issue as to any material fact." MCR 2.116(C)(10).

[3] *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999).

[4] *Bertrand v Alan Ford, Inc*, 449 Mich 606, 618; 537 NW2d 185 (1995).

[5] The facts outlined in this dissenting opinion are established in the record and based on evidence presented by the plaintiff to the Department of Treasury and in the lower courts below. Many of these facts are ignored in the majority opinion, and few—if any—are taken in the light most favorable to plaintiff. This evidence was found in letters and correspondence between plaintiff's counsel and the Department, interrogatory responses, and depositions of managers and experts. The record also includes a substantial collection of plaintiff's historical financial records, accounting statements, and tax receipts; this record was thoroughly developed in the lower courts and provided to this Court with citations.

ML was a family-owned business that specialized in natural gas, oil, and other energy infrastructure. Specifically, the company helped construct and repair pipelines to enable and facilitate distribution of vital fuels. Reuben Leines, an entrepreneur from Minnesota, founded ML in Minnesota in 1966. The company started its work in Minnesota, and expanded from there to neighboring Midwest states, specifically Wisconsin, Iowa, and North and South Dakota. The company's work in Michigan was limited, sporadic, and of overall low value to the company. Minimal work was done in Michigan year-to-year, and no significant contracts sufficient to provide a major source of income in any given year involved the Michigan market. From 50% to 70% of the company's sales from its founding up to the tax in question were in Minnesota, with residual sales being sourced to other Midwest states outside of Michigan. From 2007 and 2008, ML's largest sale in its history occurred within the company's historical market territory, totaling over $100 million in sales for a single contract in Minnesota.

In 1998, Reuben Leines retired after decades of work. Two of his children who lived and worked in Minnesota, Christopher Leines and Paulette Britzius, took over the company. The two children managed the company and were the sole owners, splitting the shares 50/50. ML remained a predominantly Minnesota-based company, but some of its sales continued to expand to other states. Its reach to Michigan remained very limited. Although the company worked in a limited capacity with Consumers Energy, the following chart shows a total valuation of sales occurring in the state of Michigan. As can be observed, in line with the company's tradition and financial history, ML had insignificant exposure to the Michigan market post-2000:

| YEAR | MICHIGAN SALES | ALL SALES | APPORTIONMENT TO MICHIGAN |
|---|---|---|---|
| 2001 | 0 | $19,577,034 | 0.0000 |
| 2002 | 0 | $25,255,248 | 0.0000 |
| 2003 | $522,713 | $38,328,523 | 0.0137 |
| 2004 | $1,428,969 | $42,391,279 | 0.0337 |
| 2005 | $1,101,714 | $46,556,704 | 0.0222 |
| 2006 | $1,011,461 | $48,270,114 | 0.0210 |
| 2007 | $957,516 | $99,876,379 | 0.0096 |
| 2008 | $3,341 | $155,164,472 | 0.00002 |
| 2009 | $22,420,073[6] | $121,058,709 | 0.1852 |

By comparison, in 2009, at least 63% of ML's revenue came from business occurring in Minnesota. In 2007 and 2008, that number was 87% and 84%, respectively.[7]

---

[6] Vectren's briefing before the Court included a typographical error for ML's aggregate in-state sales for 2009. However, the percentages underlying the in-state sales were taken from ML's tax returns and other financial documents. It was undisputed before this Court and the Court of Appeals that the percentages of sales attribution to Michigan listed in the above chart are fully accurate and complete. The amount of sales occurring in Michigan in 2009, after adjustments for tax purposes and given the accepted percentages of in-state attribution, was $22,420,073. This is corroborated by multiple uncontradicted financial statements submitted by Vectren to the Court, which indicate $22 million in sales were derived from Consumers Energy in Michigan in 2009. Given that the in-state attribution rates are undisputed and correct, and the aggregate in-state sales number for 2009 is corroborated with several other undisputed financial records, the correct in-state sales number is stated.

[7] Of note, ML contracted with Consumers Energy for a project in 2009. In that year, a mere 18% of ML's sales occurred in Michigan. The identity of Consumers Energy can be confirmed by comparing the sales description of ML's customers in a report prepared by Greene Holcomb &

ML's assets, organization, and employment contracts were even more weighted toward its central location in Minnesota and the neighboring states. The company's central management, strategy, and structural oversight took place at its headquarters in Big Lake, Minnesota. The buildings at Big Lake constituted 60,000 square feet of office space, warehouses, and construction facilities. ML also owned 22 acres of undeveloped land that was adjacent to the headquarters, all of which were located around Minneapolis suburbs (40 miles outside of the city). In addition, the company owned a 4,878 square foot facility on 3.75 acres in Bemidji, Minnesota; a 13,280 square foot facility on 4.5 acres in Superior, Wisconsin; and a 4,800 square foot facility on 5.10 acres in Altamont, Illinois. No permanent facilities or real properties were owned, leased, or operated in Michigan; no management centers were located in the state. The Minnesota corporation owned 1,195 individual pieces of equipment, notably including 53 pipelayers and 57 excavators. All of this equipment was stored and used as part of operations in Minnesota, at the company's real property locations, or close to work sites in Minnesota and neighboring states. Given the minimal amount of business in Michigan, none of the tangible property owned by ML was permanently located or stored in Michigan. ML had contracts with 600 employees. But it had no employees permanently assigned or placed in Michigan. Thirty employees were assigned to management and administration, located at the company's Minnesota headquarters and physical office locations, and 570 of the employees were on-the-ground labor. The company negotiated and entered into collective bargaining agreements with the workforce, which was represented by two unions.

---

Fisher LLC with the actual names of ML's customers, included in the purchase agreement with Vectren. The numbers therein match perfectly.

6

In the winter and spring of 2010, Christopher Leines and Paulette Britzius contemplated selling ML. The owners hired an investment firm in Minneapolis, Greene Holcomb & Fisher LLC, to develop and produce a report on ML's business and its financial metrics. Considering ML's customer base, experienced labor force and management team, and the value of its pipeline construction business, Vectren Infrastructure Services Corporation (Vectren) indicated an interest in buying ML. Specifically, Vectren wanted to use the assets and value built by ML to expand into the natural gas and energy transportation market, which was growing larger with the extraction and development of the Marcellus, Utica, and Bakken shale formations in North and South Dakota, Ohio, Pennsylvania, and West Virginia. Natural gas or other resource extraction from Michigan was not considered as part of Vectren's decision to purchase ML. In explaining Vectren's choice to purchase ML, Vectren's president, Douglas Banning Jr., provided uncontradicted testimony that Vectren "never even looked at a shale play in Michigan at all" when considering whether to purchase ML. Any natural resource development in Michigan "didn't really enter into our acquisition criteria as far as whether we wanted to acquire [ML] or not."[8]

---

[8] This is highly unsurprising given the absence of meaningful shale deposits in Michigan:

Vectren was an Indiana corporation. ML and Vectren retained counsel in Minnesota and Indiana respectively to review and negotiate the deal. The parties relied upon a Minnesota banking agent to hold the transaction's funds in escrow, they identified Minnesota courts as the mandated choice of venue in the case of disputes, and Minnesota law governed the agreement.

In late July 2010, and while ML was courting a purchase agreement with Vectren, the Kalamazoo River oil spill occurred. The spill, one of the largest inland spills in United States history, saw over 800,000 gallons of oil flow out of a broken pipeline and enter the Kalamazoo River near Marshall, Michigan.[9] Reacting to this extraordinary event, the owner of the pipeline,



U. S. Energy Information Administration, *Natural Gas Explained* <https://www.eia.gov/energyexplained/natural-gas/where-our-natural-gas-comes-from.php> (accessed July 17, 2023) [https://perma.cc/HVG8-WSB3].

[9] See U. S. Environmental Protection Agency, *FOSC Desk Report for the Enbridge Line 6b Oil Spill Marshall, Michigan* (April 2016), p 89 ("The Enbridge Line 6B pipeline release of diluted bitumen into the Kalamazoo River downstream of Marshall is one of the largest freshwater oil spills in North American history. The unprecedented scale of impact and massive quantity of oil released required the development and implementation of new approaches for detection and

Enbridge Energy Partners LLP (Enbridge), took emergency action and requested ML's immediate services to respond and properly repair the pipeline. ML and Enbridge entered into a service agreement within two weeks of the spill, and ML was on site in Michigan working on the pipeline by August 2010.[10]

ML had no permanent or consistent footprint in Michigan, with no facilities, property, or employees placed in the state. Accordingly, ML brought some equipment and a small number of full-time employees into Michigan. However, instead of transporting equipment or reassigning their workforce, ML rented most of their equipment to use in the Enbridge spill response, and all but a minimal contingent of workers were taken from local union shops for the duration of the project. ML asserted that they brought 5 pieces of equipment and 10 contracted employees into the state. Affidavits and testimony from Christopher Leines, who managed ML during the project, support that conclusion, as does ML's financial data. As part of the contract with Enbridge, ML in 2010 incurred $10,715,793 in total costs. Of the construction costs incurred by ML in 2009 and 2010, more than 45% were attributable to labor. Specifically, $46,440,250 in costs were incurred in 2009 and $44,767,410 in 2010 (including labor, payroll taxes, and employee benefits). ML's attributed labor costs for the Enbridge contract, which would include both temporary labor for the Enbridge job as well as the minimal amount of permanent employees used in Michigan for the contract, were almost 10% of the company-wide cost of labor. Further, ML provided property tax statements that indicated a total cash value of

recovery."), available at <https://www.epa.gov/sites/default/files/2016-04/documents/enbridge-fosc-report-20160407-241pp.pdf> (accessed July 17, 2023) [https://perma.cc/Z93R-ESJC].

[10] For a discussion of Enbridge's recent relationship with ML, which, like the rest of ML's sales, was primarily located outside of Michigan, see note 81 of this opinion.

9

$803,389 was located in Michigan in December 2009, which decreased to $267,977.65 in December 2010, in the midst of ML's Enbridge contract. The property in Michigan included 4 pipe handlers, 1 evacuator trailer, 3 push rollers, 2 pipe cradles, 5 pumps, lineup clamps, and counterweights, valued at $267,977.65. After discussions with local tax authorities, in March 2011, the estimated cash value for personal property was $148,637. At the time of ML's sale in March 2011, the book value of ML's equipment was valued at $3,429,239 and a purchase price of $18,354,285. Thus, the equipment ML attested to be in Michigan, documented by property tax statements, was between 1.4% and 8% of the total equipment owned by ML.

The Enbridge deal was a historic contract for ML, as the spill was a historic environmental event. The revenue produced in the Enbridge deal was the most ML had ever received in Michigan. The deal also coincided with an increase in sales to Consumers Energy during 2010.[11] As explained earlier, before the Kalamazoo River oil spill, ML's business in Michigan was sporadic, limited, and of insignificant value as compared to the rest of ML's sales. Nonetheless, even with this unexpected and immediate boost in revenue, the share of sales coming from Michigan in 2010 remained below 40%. In 2010, ML completed $110,365,790 in sales, with $43,352,830 sourced to Michigan, resulting in an apportionment of 0.3928 for Michigan. The margins earned on the deal were well in line with historical averages for ML. In 2010 to 2011 (the tax year at issue), ML's gross profit margin from the Enbridge contract was 18.1%. In 2007, 2008, 2009, and 2010, ML's overall gross profit margin was 20.3%, 19.3%, 16.1%, and 18.2%, respectively. Under ML's federal tax filing in 2011, ML's gross profit margin remained within the same range, coming in at 17.1%.

---

[11] Revenue from Consumers Energy dropped from $22.2 million in 2009 to $17.8 in 2010, corresponding to the end of a pipeline contract in 2010.

The unique and emergency nature of the Enbridge contract produced distortions and unusual means of revenue collection. ML's business in pipeline construction and maintenance was substantially reduced and constrained in the winter months. This is because digging, construction, and use of earth, which was fundamental to ML's responsibilities, is limited when the ground is frozen in cold northern winters, especially in Minnesota, where most of ML's revenue was derived. However, ML possessed the capability to service customers in the winter, and Enbridge relied upon ML to do so. Therefore, during this winter offseason, ML derived a substantial portion of its revenue from the Enbridge contract, over and above what was previously received in Michigan in the company's 52-year history and far above the proportion of work if completed in ML's summer high season. It is undisputed that the substantial rise in sales sourced to Michigan during the 2011 winter offseason derived from the Enbridge contract.[12]

ML's sale to Vectren was completed on March 31, 2011, and the fundamental conflict under Michigan tax law between the 52-year history of the Leines family company and the extraordinary nature of the Enbridge contract began to come into view. ML and Vectren

[12] The parties are apparently in agreement that substantially all the sales produced in the 2011 short year in Michigan derived from the Enbridge contract. See Plaintiff's Supplemental Brief on Appeal (May 25, 2022), p 3; Defendant's Supplemental Brief on Appeal (May 4, 2022), p 22 (describing the parties' "agreement" on the location of sales and the Enbridge contract); Defendant's Court of Appeals Brief (March 8, 2019), p 37 ("But Vectren acknowledges the business activity [ML] had in Michigan—i.e., the Enbridge contract performed during the audit period."). This is well supported in the record. At the time of ML's sale, it had 16 active contracts, with Enbridge being the only contract of material value sourced to Michigan at the end of the short year. The contract with Consumers Energy, the only other customer providing a notable amount of business in Michigan, concluded in 2010. ML's initial accounting attributed revenue of $13.3 million to the Enbridge contract during the short year. This is in line with the total sales in Michigan during the 2011 short year, valued after adjustments and review from the Department at $14.7 million.

completed a stock sale but elected to classify the deal as an asset sale. As part of the out-of-state deal, ML's property, contracts, intellectual property, and business value accumulated through decades were transferred to Vectren. In exchange, Vectren paid cash to ML, distributed directly to ML's shareholders in Minnesota. While initially the parties agreed upon a purchase price of $80 million, the ultimate value of the deal, considering added expenses and assumed debt, came to $88.6 million. From that amount, $34.4 million was in tangible assets, out of which $18.4 million was derived from equipment. In addition, $3.7 million was associated with ML's established contracts and placements with employees; $19.1 million was derived from other intangible assets such as trade names and consumer relationships; and $16.6 million was associated with goodwill.[13]

Because ML sold the entirety of its company, it filed a final tax return as an independent business, both federally and in states around the country. This was ML's "short tax year" extending from January 2011 to March 2011. To determine a company's business tax liability in Michigan, a company must multiply its tax base, i.e., its business income, by a "sales factor," which in essence is a percentage of (mostly) direct-to-consumer sales the company has within the state.[14] Therefore, at a basic level, the equation for ML to calculate business taxes in

---

[13] The remainder was associated with working capital, which included financial accounts of cash and receivables owned and controlled by ML. There is no dispute that ML reported and filed taxes in Michigan recognizing the revenue obtained from in-state contracts in the year they were earned. Thus, Michigan fully taxed ML's revenue from the Enbridge contract separately from working capital listings on the asset sale. This revenue includes the in-state sales attributed in the short-year filing to the Enbridge contract. See note 12 of this opinion. There is no contention that the Department can tax cash or cash equivalents that are transferred in the process of corporate reorganization. The financial accounts owned by ML and sold in the asset sale outside of Michigan are not considered in depth in the following analysis.

[14] There are several statutory provisions that establish this method of taxation. MCL 208.1201(1) explains that the tax amount is determined by multiplying "the business income tax base, after

Michigan was: base corporate income x (sales in Michigan / total sales by the company) x 0.0495.

In filing a return for the short year, ML attempted to properly attribute taxation given the unusual nature of the winter tax season and a highly significant company event: the sale of substantially all the company. ML included the gain on the company-wide asset sale in the tax base, making up $51 million out of $55 million, or around 93% of total income.[15] However, ML attributed the sale to out-of-state economic activity. Specifically, ML included the asset sale in

---

allocation or apportionment to this state," by "the rate of 4.95%." "The business income tax base means a taxpayer's business income" subject to a few adjustments. MCL 208.1201(2). Apportionment to the state is determined by "the sales factor." MCL 208.1301(2). The sales factor is "a fraction, the numerator of which is the total sales of the taxpayer in this state during the tax year and the denominator of which is the total sales of the taxpayer everywhere during the tax year." MCL 208.1303(1). Sales are defined under MCL 208.1115(1) and include the following categories:

> (a) The transfer of title to, or possession of, property that is stock in trade or other property of a kind that would properly be included in the inventory of the taxpayer if on hand at the close of the tax period or property held by the taxpayer primarily for sale to customers in the ordinary course of the taxpayer's trade or business. For intangible property, the amounts received shall be limited to any gain received from the disposition of that property.

> (b) The performance of services that constitute business activities.

> (c) The rental, lease, licensing, or use of tangible or intangible property, including interest, that constitutes business activity.

> (d) Any combination of business activities described in subdivisions (a), (b), and (c).

> (e) For taxpayers not engaged in any other business activities, sales include interest, dividends, and other income from investment assets and activities and from trading assets and activities.

[15] The exact amount of total direct-to-consumer sales included in the Department's apportionment, $21,093,137, had an associated profit of $3,608,484.

13

the denominator of the sales factor, which took into account the extraordinarily high proportion of Michigan activities during the short year.[16] It then calculated the sales factor, which, due to the offseason and the emergency contract in Michigan, resulted in a 14.986% attribution to the state. This was over two times the average attribution of sales in the company's modern, post-2000 history, and was over four times the company's attribution of sales to Michigan prior to the Enbridge contract. As a result, ML paid Michigan over $400,000 in income taxes, almost entirely derived from ML's company sale.

Michigan's Department of Treasury was not satisfied. It opened an audit of Vectren over three years later, in December 2014. In April 2016, the Department issued its assessment determination, which sought a substantial increase in the taxable value of ML's asset sale. Specifically, the Department determined that none of the value of the asset sale could be

---

[16] I do not agree with the majority opinion that Vectren's initial tax filing is worthy of special critique. Although the Court of Appeals concluded that this calculation conflicted with Michigan's default statutory computation of corporate tax apportionment, that was only after extensive litigation and multiple court opinions. The Court of Appeals then correctly determined that the Department's method of taxation was unconstitutional. Even though Vectren was a "sophisticated entity," there is no indication that their initial tax filing was made in bad faith or was patently unreasonable. Without analyzing a complex statutory dispute that is not before this Court, it was abundantly fair for Vectren to believe that Michigan corporate tax statutes did not, as a default, mandate unconstitutional taxation, in that income from out-of-state sales of the company's entire assets would be completely ignored in the apportionment formula and 70% of the company's value would be attributed to Michigan. See *Vectren Infrastructure Servs Corp v Dep't of Treasury*, 509 Mich 882 (2022) (directing briefing on whether the *Department's* proposed tax method was disproportionate or unconstitutional and whether remand to the agency to work with Vectren on an alternative apportionment was appropriate). Despite having no briefing on the issue, it is hard to fault Vectren for interpreting Michigan's tax statutes in a manner that complies with the United States Constitution. Further, the parties agree that Vectren petitioned for an alternative method of apportionment, even if the Department or courts were to determine that Vectren's analysis of the default statutory calculation was incorrect. That is the issue before the Court. There is no serious contention that if the Department's proposed method of apportionment is unconstitutional, it cannot be applied.

considered as part of its sourcing of income. However, the state could tax the entirety of ML's asset sale as part of ML's tax base, multiplying that number by a sales factor that excluded all revenue except for direct-to-consumer sales, i.e., the Enbridge contract. ML had almost no income from direct-to-consumer sales in these offseason winter months outside the Enbridge contract. Thus, the Department calculated a sales factor that attributed 69.9571% of ML's global income to Michigan. Given that almost all the income in the short year was derived from ML's asset sale, the Department claimed 70% of the taxable value of ML as a company, as a whole. This represented over a 400% increase in attribution from the values ML calculated, which itself favored Michigan over pre-Enbridge sales periods, and which would have paid taxes to Michigan on 15% of the value of a company that was built, maintained, and located almost entirely in Minnesota. The Department's calculations constituted over a 900% increase from attribution of the company's recent average sales history and a 2,100% increase from the company's post-2000 sales history, prior to the Enbridge contract. In addition to the tax attribution, the Department charged interest and fined ML. Given that ML was no longer a separate corporation and Vectren purchased ML's stock (although not in tax election), Vectren, ironically the buyer in the sale of ML, was ML's successor in interest and was required to pay taxes, penalties, and interest totaling $3,407,337.36.

Michigan statutes allow taxpayers to file a petition and request that the Department apply an alternative apportionment of taxes.[17] Vectren petitioned for an alternative apportionment,

---

[17] MCL 208.1309(3) explains that:

> The apportionment provisions [under Michigan's business tax code] shall be rebuttably presumed to fairly represent the business activity attributed to the taxpayer in this state, taken as a whole and without a separate examination of the specific elements of either tax base unless it can be demonstrated that the business

15

explaining that the Department's calculations were grossly disproportionate and could represent unconstitutional taxation. In so doing, Vectren cited ML's sales and financial history, its asset locations and company characteristics, and detailed business and accounting reports prepared by Greene Holcomb & Fisher LLC, who was ML's selling agent in Minnesota, and KPMG in Chicago. Vectren also pointed to the extensive tax receipt documents in the Department's possession as Michigan's taxing authority. The tax receipts described and provided data on the location of ML's business activities, specifically the amount of sales and income derived nationally and from Michigan in prior years. The documents also included ML's payroll submissions and deductions for asset depreciation in Michigan. Nonetheless, the Department declined Vectren's request for alternative apportionment and issued a final assessment of taxation in March 2017.

In April 2017, Vectren brought a declaratory-judgment action against the Department in the Court of Claims. Vectren alleged that the Department failed to accurately calculate ML's tax liability under Michigan statutory law and the United States Constitution. After a period of discovery, in which depositions and a substantial record of ML's business operations were developed, the parties filed cross-motions for summary disposition under MCR 2.116(C)(10) for lack of a genuine issue of material fact. The Court of Claims granted summary disposition in favor of the Department. In a unanimous opinion, the Court of Appeals reversed, concluding that the proposed tax was unconstitutional and under Michigan corporate statutes, the

activity attributed to the taxpayer in this state is out of all appropriate proportion to the actual business activity transacted in this state and leads to a grossly distorted result or would operate unconstitutionally to tax the extraterritorial activity of the taxpayer.

16

Department was required to adopt an alternative method of calculation.[18] The Court of Appeals directed that judgment be entered in favor of Vectren and remanded the case for the Department to determine an alternative method.[19]

The Department sought leave to appeal in this Court, and we vacated the Court of Appeals decision and remanded the case to the Court of Appeals to address whether the Department had initially calculated the tax properly under Michigan's corporate tax code.[20] Specifically, the Court remanded on the issue of whether ML's asset sale was properly excluded from the sales factor calculation. On remand, the Court of Appeals confirmed that the Department's proposed taxation was permissible as a default method of taxation under Michigan statutory law but reiterated that the Department is statutorily required to apply an alternative method of taxation if the tax is disproportionate or unconstitutional.[21] The Court of Appeals readopted its initial analysis that the tax was disproportionate and unconstitutional, reversed the Court of Claims, and remanded the case for an alternative assessment.[22]

The Department again sought leave to appeal in this Court, and we ordered oral argument on the Department's application.

---

[18] *Vectren Infrastructure Servs Corp v Dep't of Treasury*, 331 Mich App 568, 583-586; 953 NW2d 213 (2020), vacated 506 Mich 964 (2020).

[19] *Id*. at 586.

[20] *Vectren Infrastructure Servs Corp v Dep't of Treasury*, 506 Mich 964 (2020).

[21] *Vectren Infrastructure Servs Corp v Dep't of Treasury (On Remand)*, 339 Mich App 117, 124; 981 NW2d 116 (2021).

[22] *Id*.

## II. ANALYSIS

The question presented to the Court is whether the business activity attributed to ML in Michigan for the short tax year from January 2011 to March 2011 is "out of all appropriate proportion to the actual business activity transacted in this state and leads to a grossly distorted result or would operate unconstitutionally to tax the extraterritorial activity of the taxpayer."[23] On the record before the Court, I conclude that the Department's extraordinary upward assessment of ML's taxable income was unconstitutional and disproportionate. ML offered to attribute to Michigan 15% of a company-wide asset sale that had little to nothing to do with this state, solely on the basis of ML's choice to temporarily assist in the response to an environmental crisis in the state. The initial calculation provided by ML to the Department was abundantly reasonable, and in fact, more precise calculations of economic value would have produced attributions far lower than what ML initially offered. The Court of Appeals provided a thorough and convincing analysis, and its decision should be affirmed.

### A. STANDARD OF REVIEW

This case comes to us on appeal from cross-motions for summary disposition under MCR 2.116(C)(10). Under that standard, summary disposition is warranted if there is no "genuine issue as to any material fact."[24] The Court must review the record and take "all legitimate

---

[23] MCL 208.1309(3).

[24] MCR 2.116(C)(10).

18

inferences in the light most favorable to the nonmoving party."[25]  If the evidence presents no

genuine issue of fact, "the moving party is entitled to judgment as a matter of law."[26]

## B.  THE DUE PROCESS CLAUSE, THE COMMERCE CLAUSE, AND OUT-OF-STATE ECONOMIC ACTIVITY

Much of the constitutional jurisprudence on interstate taxation derives from the birth and

development of the modern corporation, which has yielded economies of scale, inter-department

specialization, and integration of a diverse array of economic tasks and assets.  While this has

produced unprecedented value for the companies themselves, and the country as a whole, it has

also proved to be a substantial challenge for local and state taxing authorities.  The actual value

of property located within a specific jurisdiction could be minimal, yet that same property could

play an indispensable part for a larger unified business operation.  For example, the Supreme

Court of the United States observed that rail lines passing through a state to deliver goods,

services, or people to a different destination were on their own "of little value."[27]  However, the

railroad operation, as a whole, had "an interest much more important than it has in the limited

part of it lying" in metal lines on property.[28]  Thus, the Supreme Court sanctioned the use of

"unitary business taxation," otherwise called the "unitary business principle."[29]  A state through

---

[25] *Coblentz v Novi*, 475 Mich 558, 567-568; 719 NW2d 73 (2006).

[26] *Maiden*, 461 Mich at 120.

[27] *Taylor v Secor*, 92 US 575, 608; 23 L Ed 663 (1875).

[28] *Id*.

[29] *MeadWestvaco Corp v Illinois Dep't of Revenue*, 553 US 16, 25; 128 S Ct 1498; 170 L Ed 2d 404 (2008) ("[W]e have developed the unitary business principle" in which "a State need not isolate the intrastate income-producing activities from the rest of the business but may tax an apportioned sum of the corporation's multistate business if the business is unitary.") (quotation marks and citation omitted).

19

which the rail line ran could apply a tax by calculating the portion of a rail line that ran through the state and thereafter apportioning the value of the rail line, as a whole, based on that percentage of rail line that was placed in the state. The state thereby reasonably calculated the value of in-state activity of a consolidated multistate enterprise for purposes of in-state taxation.[30]

The Supreme Court has resisted invalidating under the Constitution state laws that regulate in-state activities and have remote and indirect effects on out-of-state activities.[31] Such a strict constitutional standard would largely result in courts overriding policy choices of local jurisdictions. Nonetheless, the Supreme Court has long made clear that borders matter. Constitutional principles drawn from due process and the Commerce Clause support the notion that states cannot regulate, control, or otherwise make illegal actions or behavior that occur

---

[30] *Taylor*, 92 US at 608 ("It may well be doubted whether any better mode of determining the value of that portion of the track within any one county has been devised than to ascertain the value of the whole road, and apportion the value within the county by its relative length to the whole."); *Adams Express Co v Ohio State Auditor*, 165 US 194, 220; 17 S Ct 305; 41 L Ed 683 (1897) ("As to railroad, telegraph, and sleeping-car companies, engaged in interstate commerce, it has often been held by this court that their property, in the several states through which their lines or business extended, might be valued as a unit for the purposes of taxation, taking into consideration the uses to which it was put, and all the elements making up aggregate value, and that a proportion of the whole, fairly and properly ascertained, might be taxed by the particular state, without violating any federal restriction."); *MeadWestvaco*, 553 US at 30 (describing the " 'hallmarks' of a unitary relationship as functional integration, centralized management, and economies of scale").

[31] See *Nat'l Pork Producers Council v Ross*, 598 US ___, ___; 143 S Ct 1142, 1149-1150; 215 L Ed 2d 336 (2023) (holding that a state law regulating products sold inside the state was not unconstitutional and rejecting a per se rule against in-state laws that affect out-of-state economic behaviors).

wholly outside of the state.[32]  This rule protects individuals from shifting and competing laws, provides consistency and predictability in out-of-state activities, and preempts reprisals and capricious government behavior.[33]  It also protects states' independent sovereignty and the

---

[32] *Id*. at ___; 143 S Ct at 1156 ("In rejecting petitioners' 'almost *per se*' theory we do not mean to trivialize the role territory and sovereign boundaries play in our federal system."); *Healy v Beer Institute, Inc*, 491 US 324, 336; 109 S Ct 2491; 105 L Ed 2d 275 (1989) (holding that states are precluded from applying " 'a state statute to commerce that takes place wholly outside of the State's borders' "), quoting *Edgar v MITE Corp*, 457 US 624, 642-643; 102 S Ct 2629; 73 L Ed 2d 269 (1982); *Pike v Bruce Church*, 397 US 137, 142; 90 S Ct 844; 25 L Ed 2d 174 (1970) (holding, when reviewing a state statute that affects interstate commerce, that state laws with "legitimate *local* public interest" that incidentally burden interstate commerce in a way that is not "clearly excessive in relation to the putative *local* benefits" are permissible) (emphasis added); *Shaffer v Heitner*, 433 US 186, 197; 97 S Ct 2569; 53 L Ed 2d 683 (1977) (explaining that state courts cannot, as a state sovereign authority, " 'directly' . . . assert extraterritorial jurisdiction over persons or property" because such an act would "offend sister States and exceed the inherent limits of the State's power"); *Burger King Corp v Rudzewicz*, 471 US 462, 472; 105 S Ct 2174; 85 L Ed 2d 528 (1985) (stating that a state court can exercise jurisdiction over an out-of-state defendant only when "the litigation results from alleged injuries that arise out of or relate to" that defendant's activities directed "at residents of the forum") (quotation marks and citation omitted); *Strassheim v Daily*, 221 US 280, 285; 31 S Ct 558; 55 L Ed 735 (1911) (explaining that a state may criminally prosecute an individual for acts performed outside the state when the individual's acts "intended to produce and [do] produc[e] detrimental effects within it"); *Bonaparte v Tax Court*, 104 US 592, 594; 26 L Ed 845 (1881) (holding that exclusion from taxation of certain debt purchases in one state could not control the taxation of individuals residing in another state because "[n]o State can legislate except with reference to its own jurisdiction").

[33] See *HP Hood & Sons, Inc v Du Mond*, 336 US 525, 534-535; 69 S Ct 657; 93 L Ed 865 (1949) ("While the Constitution vests in Congress the power to regulate commerce among the states, it does not say what the states may or may not do in the absence of congressional action, nor how to draw the line between what is and what is not commerce among the states.  Perhaps even more than by interpretation of its written word, this Court has advanced the solidarity and prosperity of this Nation by the meaning it has given to these great silences of the Constitution."); *Healy*, 491 US at 335-336 (explaining that the Constitution has a "special concern . . . with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce"); *Hughes v Oklahoma*, 441 US 322, 325; 99 S Ct 1727; 60 L Ed 2d 250 (1979) (reasoning that the Constitution worked to prevent "economic Balkanization" created through divergent and competing regulatory regimes); *Gwin, White & Prince Inc v Henneford*, 305 US 434, 439; 59 S Ct 325; 83 L Ed 272 (1939) (explaining that a tax on business sales that did not

state's ability to determine the course of public policy within its own borders, which would be substantially undermined if other states could extend their policy choices directly into out-of-state jurisdictions and activity. The Supreme Court has "recognized the usual legislative power of a State to act upon persons and property within the limits of its own territory, a feature of our constitutional order that allows different communities to live with different local standards."[34] The demands of due process and the Commerce Clause serve to vindicate democracy, not subvert it. This principle has been understood as far back as the Marshall Court, which in *Gibbons v Ogden* repeatedly emphasized a state's authority to regulate "within [its] territory." However, the Court in *Gibbons v Ogden* notably cited the "great force" of a limitation on regulating "commerce with foreign nations and among the States."[35]

These constitutional doctrines apply to state tax law, as they do any legal burden or obligation. The Supreme Court explained the standard in *MeadWestvaco Corp v Illinois Dep't of Revenue*:

---

properly value in-state activities was unconstitutional and noting that if one state were permitted to apply such a tax, other states could apply the same tax on the same activities); see also *Burger King*, 471 US at 472 (reasoning that due-process protections requiring a connection between the state and the individual's action provide "a degree of predictability to the legal system that allows potential [individuals] to structure their primary conduct") (quotation marks and citation omitted).

[34] *Ross*, 598 US at ___; 143 S Ct at 1156 (quotation marks and citations omitted); see also *Du Mond*, 336 US at 533-534 ("The desire of the Forefathers to federalize regulation of foreign and interstate commerce stands in sharp contrast to their jealous preservation of power over their internal affairs."); *Healy*, 491 US at 336 (emphasizing that the constitutional limitations on regulation of interstate commerce vindicate "the autonomy of the individual States within their respective spheres").

[35] *Gibbons v Ogden*, 22 US (9 Wheat) 1, 203-209; 6 L Ed 23 (1824) (noting a state's power to regulate "internal commerce of a State" and "provide for the health of its citizens").

22

The Commerce Clause and the Due Process Clause impose distinct but parallel limitations on a State's power to tax out-of-state activities. The Due Process Clause demands that there exist some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax, as well as a rational relationship between the tax and the values connected with the taxing State. The Commerce Clause forbids the States to levy taxes that discriminate against interstate commerce or that burden it by subjecting activities to multiple or unfairly apportioned taxation. The broad inquiry subsumed in both constitutional requirements is whether the taxing power exerted by the state bears fiscal relation to protection, opportunities and benefits given by the state—that is, whether the state has given anything for which it can ask return.[36]

Therefore, the basic demand of the Due Process Clause and Commerce Clause is that the economic value being subject to tax must be derived from in-state activities.[37] And it applies even when considering the unitary business doctrine. In fact, the unitary business theory is an accurate reflection of economic reality, in that dispersed assets administered by a multistate

---

[36] *MeadWestvaco*, 553 US at 24-25 (quotation marks and citations omitted).

[37] See *Container Corp of America v Franchise Tax Bd*, 463 US 159, 164; 103 S Ct 2933; 77 L Ed 2d 545 (1983) (reiterating that the central demand of the Constitution with regard to tax application is that states cannot "tax value earned outside its borders") (quotation marks and citation omitted); *Trinova Corp v Mich Dep't of Treasury*, 498 US 358, 374-384, 386; 111 S Ct 818; 112 L Ed 2d 884 (1991) (reasoning that states may not constitutionally "tax burdens and import tax revenues," analyzing the economic value of sales and assets within a jurisdiction, and concluding that a "three-factor" attribution system is constitutional); *Miller Bros Co v Maryland*, 347 US 340, 342; 74 S Ct 535; 98 L Ed 744 (1954) ("No principle is better settled than that the power of a state, even its power of taxation, in respect to property, is limited to such as is within its jurisdiction.") (quotation marks and citation omitted); *Taylor*, 92 US at 608 (providing the foundations of the unitary business theory of taxation and stating that states may constitutionally apply a tax that "apportion[s] the value within the [jurisdiction]"); *Butler Bros v McColgan*, 315 US 501, 506-509; 62 S Ct 701; 86 L Ed 991 (1942) (emphasizing that a state may reasonably apportion tax liability based on the "business done there" and not "extraterritorial values" and noting that a tax attribution on regular business sales based on property, payroll, and sales located *within the state* satisfies constitutional requirements); *Adams Express Co*, 165 US at 220 (explaining that states may tax a proportion of "value . . . fairly and properly ascertained").

The majority opinion at no point materially disputes the basic principle taken from this caselaw, which limits taxation to reasonable determinations of in-state economic values.

organization can produce substantial real economic value within the state's borders, beyond a mere book-value accounting of the physical assets placed in the state.[38]   The realities of economies of scale and modern corporate organization do not in any way change the fundamental inquiry of our Constitution and its demand that states tax the economic values only within their jurisdiction.

But valuing economic activity can be difficult,[39] and the Constitution does not define an exclusive method by which states must calculate taxes.[40]   The Supreme Court has recognized this, providing room for states to attempt in good faith to attribute economic activity to their jurisdictions.   The ultimate inquiry is whether the tax attempting to be applied constitutes a

---

[38] See *Adams Express Co*, 165 US at 220-221 ("The valuation was, thus, not confined to the wires, poles, and instruments of the telegraph company, or the roadbed, ties, rails, and spikes of the railroad company, or the cars of the sleeping-car company, but included the proportionate part of the value resulting from the combination of the means by which the business was carried on,—a value existing to an appreciable extent throughout the entire domain of operation.").

The majority opinion suggests that the source of economic activity is largely irrelevant when dealing with taxation of a unitary business.   That is in direct conflict with the jurisprudential underpinnings of the unitary business doctrine, which relies on the economic reality of accurately attributing activity to the taxing state, and the established body of Supreme Court caselaw, which prevents states from extending their jurisdiction beyond activities and economic values within their borders.   See also notes 71 and 77 of this opinion.

[39] See *Trinova*, 498 US at 379 ("The same factors that prevent determination of the geographic location where income is generated, factors such as functional integration, centralization of management, and economies of scale, make it impossible to determine the location of value added with exact precision."); *Container Corp*, 463 US at 182 ("Both geographical accounting and formula apportionment are imperfect proxies for an ideal which is not only difficult to achieve in practice, but also difficult to describe in theory.").

[40] See *Trinova*, 498 US at 387 (reaffirming that there is no "single constitutionally mandated method of taxation") (quotation marks and citation omitted).

24

"reasonable sense of how income is generated"[41] and is a "fair apportionment"[42] of the value generated by the enterprise within the taxing jurisdiction. The Supreme Court has struck down taxes that are "out of all appropriate proportion to the business transacted . . . in that state"[43] and that have "led to a grossly distorted result."[44]

## C. THE DEPARTMENT'S 70% ATTRIBUTION OF ML'S COMPANY-WIDE SALE TO MICHIGAN IS DISPROPORTIONATE AND UNCONSTITUTIONAL

It cannot fairly be said that the Department reasonably calculated the economic value of ML's activities in the state when it assessed the tax in 2011. Michigan claimed 70% of ML's value as an entire company. Vectren purchased ML in what was for all intents and purposes a stock sale, purchasing equity from Christopher Leines and Paulette Britzius. Given that an asset sale of all a corporation's assets and liabilities for cash consideration is economically equivalent to an equity sale, the parties agreed to allow taxing authorities to "look through" to the assets

---

[41] *Container Corp*, 463 US at 169.

[42] *Trinova*, 498 US at 385; see also *Hans Rees' Sons, Inc v North Carolina*, 283 US 123, 133; 51 S Ct 385; 75 L Ed 879 (1931) (explaining that a tax falls outside the Constitution's parameters when the value calculated within the state is "not reasonably attributable to the processes conducted within the borders of that state"); *Underwood Typewriter Co v Chamberlain*, 254 US 113, 120-121; 41 S Ct 45; 65 L Ed 165 (1920) (reasoning that a tax is constitutional if it applies to the "fair share" of the activities within the state to tax "only the profits earned within the state"); *Allied-Signal, Inc v Dir, Div of Taxation*, 504 US 768, 780; 112 S Ct 2251; 119 L Ed 2d 533 (1992) (stating that a tax is unconstitutional if it "tax[es] value or income that cannot in fairness be attributed to the taxpayer's activities within the State").

[43] *Hans Rees' Sons*, 283 US at 135.

[44] *Norfolk & W R Co v Missouri State Tax Comm*, 390 US 317, 326; 88 S Ct 995; 19 L Ed 2d 1201 (1968).

underlying the equity transaction.[45] Undoubtedly, if the parties had agreed to classify their stock sale as a stock sale, Michigan would have claimed very little if any of the income derived from the sale.[46] However, regardless of the procedure of sale, the result in terms of calculation of economic value by jurisdiction is the same. It is undisputed that ML had no physical assets permanently located in Michigan. It had no physical structures, it had no facilities, and it had no warehouses in the state. The infrastructure and physical structures by which the corporation was run, i.e., the company's base of operations, was located entirely outside of Michigan. The value of these facilities was $16 million, which was derived from properties and plants located in Big Lake, Minnesota; Bemidji, Minnesota; Superior, Wisconsin; and Altamont, Illinois. The undisputed facts show that ML's oversight, strategy, and control derived from the corporate headquarters in Big Lake, Minnesota, where ML's management performed their duties. While the Department can tax the value produced by income generated by these buildings in

---

[45] See *Rite Aid Corp v United States*, 255 F3d 1357, 1358 (CA Fed, 2001) (explaining that the business sale method used by ML allows for the treatment of a sale of stock as a sale of assets "for tax purposes"); 33 Am Jur 2d, Federal Taxation (May 2023 update), ¶ 5100 (explaining that the procedure allows the buyer to "get a stepped-up basis for the target's assets" through an otherwise stock sale); see also The Hartford, *What Are You Selling? Assets or Stocks?* <https://www.thehartford.com/business-insurance/strategy/sell-a-business/asset-sale-vs-stock-sale#:~:text=Assets%20or%20Stocks%3F,benefits%20from%20an%20asset%20sale> (accessed July 19, 2023) [https://perma.cc/372V-GRZP] (stating the basic differences between a stock and asset sale of a business and illustrating that the only economic difference between the two is if less than all the assets or liabilities are included in the asset deal); *Feldman v Comm'r of Internal Revenue*, 779 F3d 448, 455-457 (CA 7, 2015) (explaining, in the context of a tax dispute applying the substance-over-form theory in tax law, how the economic reality of a complete asset sale can be equivalent to a stock sale).

[46] MCL 206.112(3) ("Capital gains and losses from sales or exchanges of intangible personal property are allocable to this state if the taxpayer is a resident partnership, estate or trust or individual of this state or has a commercial domicile in this state.").

Michigan,[47] which it did by imposing a tax on ML's income on sales in Michigan, the state grabbed in its sweeping net the direct value of out-of-state real properties under the control and supervision of other jurisdictions.[48] No apportionment was given to account for these dispersed, out-of-state physical properties.

The company owned 1,195 individual pieces of equipment, a small fraction of which was used or operated in Michigan. The record evidence supports the conclusion that, at the beginning of the Enbridge contract, only five pieces of equipment were brought into Michigan. Christopher Leines provided sworn statements describing the limited extent to which equipment was used and establishing that the substantial majority of the equipment for the Enbridge contract was rented. Property tax receipts show that less than 10% of the value of ML's tangible property was located within Michigan during the winter of 2010 to 2011, and the allocated cost of depreciation for the short tax year equaled less than 10% of the book value of the equipment sold on March 31, 2011.[49] Furthermore, it is undisputed that Michigan was not a permanent location

---

[47] See *Trinova*, 498 US at 374-379 (explaining how income derived from production or other physical activities out of state could be properly sourced, at least in part, to the location of sales).

[48] See notes 32 and 37 of this opinion. Under common tax principles, the value of real estate is taxed at the location of the property. See 72 Am Jur 2d, State and Local Taxation (June 2023 update), § 524 ("Real property is subject to taxation in the taxing jurisdiction or state where it is located, or situated, regardless of whether the owner is a resident or a nonresident.") (citations omitted); 84 CJS, Taxation (May 2023 update), § 401 ("Real property and interests therein are taxable in the taxing district where the property is actually situated and not elsewhere.") (citations omitted); see also 67B Am Jur 2d, Sales and Use Taxes (May 2023 update), § 16 (stating that, when taxing a sale, it is "the situs of the sale that controls, and not the citizenship of the seller").

[49] A review of ML's financial statements, cited and produced by Vectren, shows that 2% of ML's annual costs were associated with depreciation on equipment. The allocated cost in the short year equaled less than 10% of the equipment's book value.

27

or storing area for ML's equipment, but merely a location where some equipment was brought to respond to contracts located in the area. ML sold these assets under legal title owned by a Minnesota company to an Indiana company in a sale negotiated and produced entirely outside of Michigan. This is an out-of-state sale with a substantial majority of assets located outside the state. Even those located in Michigan at the time of sale were not in Michigan under a permanent placement and were sold as small parts of a larger business operation with an insignificant footprint in the state. While Michigan could tax a reasonable apportionment of value provided within the state by the equipment, such as through property taxes or other consumption taxes, Michigan cannot apply a 70% allocation of equipment sales occurring wholly outside of its jurisdiction.[50] Substantial taxation of the sale of even those assets which by happenstance were located in Michigan temporarily constitutes an unapportioned tax on interstate commerce.[51] The

---

[50] It is possible that sales of goods and services occurring out of state could be attributed to economic activity in the state through unitary business operations, based on the management, oversight, and consolidated operations in state. Yet here there are no permanent physical properties in Michigan, no operations management or control derived from the state for the enterprise as a whole, and an otherwise minimal commercial footprint in the state. Attributing these out-of-state sales of permanent equipment to Michigan is a far cry from reasonably valuing the unitary business operation.

[51] See *JD Adams Mfg Co v Storen*, 304 US 307, 310-311; 58 S Ct 913; 82 L Ed 1365 (1938) (explaining that a tax on values occurring within the state, including sales or property taxes in-state, was constitutional but that a tax on income without proper consideration of the location of sale was unconstitutional); *McGoldrick v Berwind-White Coal Mining Co*, 309 US 33; 60 S Ct 388; 84 L Ed 565 (1940) (upholding a tax on sales occurring within a state and involving deliveries in the state); *Miller Bros*, 347 US at 342-343 (holding that a de facto tax on commercial sales occurring with out-of-state businesses, with delivery of goods out of state, was unconstitutional and noting that "[w]here there is jurisdiction neither as to person nor property, the imposition of a tax would be ultra vires and void") (quotation marks and citation omitted); *American Trucking Associations, Inc v Scheiner*, 483 US 266; 107 S Ct 2829; 97 L Ed 2d 226 (1987) (concluding that a fee on property located within the state and consumption taxes for use of the property in the state were constitutional but that a flat tax on property used as part of interstate commerce was unconstitutional); *Minnesota v Blasius*, 290 US 1, 9; 54 S Ct 34; 78 L

Department does not apply any consideration of the location of the equipment, the residence of its owner and where legal title resides, the limited placement for a temporary period in Michigan, or the location of the sale. That is a misallocation of $18.4 million in equipment.

It is also undisputed that ML had contract rights to the services of 600 employees, all of whom were given permanent assignments and default work locations outside of Michigan. As a Minnesota-based company, ML negotiated and entered collective bargaining agreements owned as assets in Minnesota, and no employees were permanently stationed or given long-term assignments to Michigan. Once the Kalamazoo River oil spill occurred, ML of course needed to redeploy some of its out-of-state labor to effectively complete the job. However, the uncontradicted record demonstrates that ML transferred virtually none of its labor force to Michigan and instead hired most of its workers on a temporary basis from Michigan union shops. The attributable cost of labor incurred when ML moved assets into Michigan to serve the Enbridge contract, which amounted to less than 10% of ML's overall labor costs, as well as sworn statements from ML's management, support this conclusion. Certainly, Michigan could tax the labor occurring within the state, the contract to purchase temporary union labor in the state, or a portion of the income derived from ML's services within the state. Taxing 70% of the value of union contracts owned and sold out of state as well as the value of permanent employee placements, the vast majority of which did not interact with the Michigan market, is a gross

---

Ed 131 (1933) (reasoning that while states may not tax "property in transit in interstate commerce," states may tax the property directly to the extent the value is attributable to the state and has "come to rest" in the state).

distortion of the economic value of labor in Michigan. This is another $3.7 million derived from ML's sale that was misallocated.[52]

Out of the remainder of ML's sale's price, $19.1 million was derived from intangible assets such as trade names, preexisting consumer relationships, and goodwill. The most prominent preexisting relationships were those of Enbridge, Koch, and Minnesota Pipeline, all of which provided business around ML's central location in Minnesota.[53] ML's intellectual

---

[52] The undisputed record shows that ML built its experience, name, and value over decades of out-of-state labor. Undoubtedly, much of the available labor to ML at the time of sale established and elevated the value assigned to intangibles such as customer relationships, goodwill, and trade name. Thus, the $3.7 million assigned to the cost of the existing labor contracts alone does not fully capture the full value of ML's out-of-state labor. As explained more fully later in this opinion, labor is one of the foundational factors of economic productivity and serves as one of three basic elements to the Supreme Court's "benchmark" of tax apportionment: the "three-factor" method. See *Container Corp*, 463 US at 170; *Trinova*, 498 US at 380 (explaining factors of productivity and the manner by which economic value is generated); see also Federal Reserve Bank of St. Louis, *Factors of Production* <https://www.stlouisfed.org/en/education/economic-lowdown-podcast-series/episode-2-factors-of-production> (accessed July 20, 2023) [https://perma.cc/5RM7-2GKV] (explaining the economics of factors of production and stating that "land, labor, capital, and entrepreneurship," i.e., management and intellectual property, are the "building blocks of the economy"); *S C Johnson & Son, Inc v Transp Corp of America, Inc*, 697 F3d 544, 558 (CA 7, 2012) (stating how the basic "factors of production" are influenced by laws and how those factors then "drive[] market transactions" through setting costs, prices, and output) (quotation marks and citation omitted).

[53] As already explained, Vectren's consideration of future growth was focused mostly on the Marcellus, Utica, and Bakken shale formations in Ohio, Pennsylvania, and West Virginia. Vectren's president provided uncontradicted testimony that the company valued most ML's consumer relationships with Minnesota Pipeline, Koch, and Enbridge, all of which are out-of-state companies. No party denies Enbridge was a recurring customer. But the reference point for recurring customer relationships was the company's history, i.e., the time prior to the 2011 short year when ML was working solely with Enbridge for an emergency contract. Vectren provided extensive proof that the sales from Enbridge and other recurring customers occurred almost entirely out of state. KPMG noted that it relied upon customers from 2007 to 2010 as part of its valuation, and during that period, less than 15% of sales were attributed to Michigan, including the unusual Enbridge contract in Michigan. Notably, in the years after ML's acquisition, less than 3% of Vectren's sales were associated with Michigan.

property was owned in Minnesota and sold in an exchange outside of Michigan. Outside of small values produced by relationships with Consumers Energy in Michigan, almost all of the preexisting business derived from out-of-state contacts. Like all income streams, revenue from intangible assets such as dividends can be apportioned by state. However, like all state taxes, it must be derived from the economic value produced intrastate.[54] Given that the undisputed record shows that ML established contracts with existing customers, built a reputation, and developed experience in the market through overwhelmingly out-of-state activities and labor, protected by intellectual property and contract rights owned out-of-state, a 70% valuation of intangible assets to Michigan is grossly disproportionate.[55]

Vectren also purchased $16.6 million of ML's goodwill. The parties appear to agree that the economic value of goodwill would be the result of historical operations of the company. As the Department itself explained in an agency memo, "[b]ecause it is difficult to identify the income-producing activity in each state and because the company headquarters tends to be where the company's brand is created, developed, monitored, and protected, the greater proportion of the cost of performance is generally in the state where the company is domiciled." This position is well in line with standard allocation of taxation values for goodwill and other intangible property.[56] Yet under the established record, ML had very little commercial development within

---

[54] See *Mobil Oil Corp v Comm'r of Taxes of Vermont*, 445 US 425; 100 S Ct 1223; 63 L Ed 2d 510 (1980) (holding that Vermont could tax intangible property of dividend distributions in the ordinary course of business by attributing value in state using a three-factor calculation).

[55] See note 56 of this opinion.

[56] See 72 Am Jur 2d, State and Local Taxation (June 2023 update), § 540 (explaining that, generally, the situs of intangible property "is at the domicile of the owner or the residence of the owner of legal title, and only there, regardless of the actual location of the evidence of the intangible as a debt") (citations omitted); *id*. at § 544 (providing that states may tax intangibles

Michigan throughout the company's 52-year history. The company was founded and based out of Minnesota, grew from that state into neighboring states, and had little to no contracts or sales in the state of Michigan for its business history leading up to 2000. In the years from 2000 to the Kalamazoo River oil spill in 2010, 3% of ML's sales were located in Michigan. And even with the jump in sales due to the emergency Enbridge contract, ML's Michigan-based sales for the prior 10-year period was 7%. From the founding of the company to the 2011 short year, ML's operations, corporate development, and management were located in Minnesota. Further, Vectren's president provided uncontradicted testimony that Michigan's market and natural resources did not affect the company's considerations in purchasing ML. Thus, through the development of ML's company history, its brand name, experience in the field, and consumer value were derived almost entirely from outside of Michigan. The Department gave no consideration to these out-of-state values when it attributed 70% of ML's entire corporate intangibles to in-state activities.

The location of ML's sale matters for properly attributing economic value.[57] In addition to the fact that the assets sold were almost entirely located out of the state, the sale itself was by an out-of-state buyer, purchasing the ownership position from Minnesota owners, involving out-

___

from other states to the extent of the "value of the intangibles used there"); accord 84 CJS, Taxation (May 2023 update), § 422; 67B Am Jur 2d, Sales and Use Taxes (May 2023 update), § 16 (explaining that taxation on a sale of property is attributed to the "situs of the sale"); 85 CJS, Taxation (May 2023 update), § 2068 (noting constitutional limitations); see also 26 USC 865(d)(3) (providing income-sourcing rules for personal property sales and indicating that goodwill is sourced where "[the] goodwill was generated" and that other intangibles, such as trade names, are sourced to the taxpayer's residence).

[57] See, e.g., *Trinova*, 498 US at 376 (reasoning that, no matter where the economic processes to develop an asset may have occurred, the location of actual sale is an integral part of economic interactions and plays an important role in the "value added" for corporate income).

of-state negotiations, and relying upon out-of-state intermediaries. The sale itself had almost nothing to do with Michigan, and if the parties had classified the transfer as an economically equivalent stock sale, Michigan would have claimed little to none of the income derived from the sale.[58]

The horizon of time considered by the Department also matters. Here, the Department calculates the tax by taking a short, three-month period, calculating the direct-to-consumers sales for only that period, and attributing that percentage of sales to the sale of all assets in the company. That is not only grossly disproportionate in value, but severely temporally skewed. The undisputed facts demonstrate that ML's Enbridge contract required a spike in work during periods of the year when most of the company is idle or performing insubstantial work. In order to respond to the environmental emergency in the Kalamazoo River, ML had to work through the winter. Not only was work performed for the Enbridge contract the most ML had ever performed in Michigan, but the work was also done during a time of year when virtually no other sales were occurring in the rest of the country, including ML's central location in Minnesota. The Department did not consider the location of the assets, the location of the sale, or the broader scope of time that would adequately capture ML's economic activity in the state. The 2011 short year was a far cry from a typical "unitary business" operation, under which the majority opinion justifies the instant tax.[59] Not "every unitary business" sells all of its corporate rights, property, employee contracts, and intellectual property that it has built over decades through out-of-state activity, recoups a massive amount of income through an out-of-state corporate sale, and receives

_____

[58] See notes 45 and 56 of this opinion.

[59] *Ante* at 31 n 12 (majority opinion).

a 70% tax apportionment on that entire body of income to a state with little connection to the company's activities, based solely on a comparatively small amount of direct-to-consumer sales from a narrow three-month period of time when the company was performing an offseason contract in response to an environmental emergency.[60] The tax imposed here does not fairly capture a reasonable valuation of ML's in-state activities, even giving a degree of room for the state to perform proper attribution.[61]

Even with almost no activity in the state, ML offered to provide Michigan 15% of the value of the company's sale by valuing the unprecedented Michigan short-year sales but sourcing the asset sale to out-of-state activities. The United States Supreme Court has repeatedly stated that an attribution formula that equally considers labor, property, and sales is a "benchmark against which other apportionment formulas are judged."[62] This "three-factor formula," while imperfect, has "a powerful basis in economic theory"[63] because "payroll, property, and sales appear in combination to reflect a very large share of the activities by which value is generated."[64] The Supreme Court, in fact, considered and declined to constitutionally eliminate sales attribution for income entirely when it upheld the application of the three-factor method.[65] Yet the application of this benchmark theory of economic value, if considered in this case,

---

[60] *Id*.

[61] See notes 39 to 42 of this opinion; see also notes 32 and 37 of this opinion.

[62] *Container Corp*, 463 US at 170.

[63] *Id*. at 183 n 20.

[64] *Trinova*, 498 US at 381 (quotation marks, citation, and emphasis omitted); *id*. (explaining that the attribution has "wide approval") (quotation marks and citation omitted).

[65] *Id*. at 384.

illustrates the significant distortions in the Department's apportionment. None of ML's assets were owned in Michigan, no real property was located in the state, a small portion of its equipment was temporarily placed in the state for an emergency contract, and none of its permanent employees were assigned to the state, while short-term contracts were used for local labor. Furthermore, a more accurate scope of consideration demonstrates that a substantial minority of sales were located in Michigan, whether including the asset sale or considering direct-to-consumer sales for the prior decade, if not longer. While the income generated from ML's contract with Enbridge, whether directly or through an attribution from a unitary business operation, was taxable by the Department, such income does not even approach an $88 million asset sale of ML as a corporation.[66] The record demonstrates that a proper three-factor valuation of ML's activities reveals almost no property footprint, minimal payroll, and insignificant sales in Michigan. Even if a single factor of sales is used, the Department entirely ignored the location of ML's asset sale, which was out of state. Instead of using the three-factor model or the location of all sales, the Department used only direct-to-consumer sales and only for a three-month period. ML's proposal of 15% valuation to Michigan was abundantly reasonable, and much more in line with evaluations sanctioned by the Supreme Court of the United States than the valuation employed by the Department.

In *Container Corp of America v Franchise Tax Bd*, a corporation with substantial operations in California sued the state for the allocation of foreign subsidiary income to in-state activities using the three-factor method.[67] Notably, in *Container Corp*, California took into

---

[66] ML made $5 million in profits from the Enbridge contract in 2010 and $2 million during the 2011 short year.

[67] *Container Corp*, 463 US at 162-163.

consideration the out-of-state assets and operations and lowered its attribution to the state when expanding the horizon of taxation, from around 10% and 11% to around 8%.[68]  Furthermore, the state was seeking to tax the company's income derived from direct-to-consumer sales around the world in a unitary business operation.  Unlike the Department in the present case, the state in *Container Corp* was not seeking to tax 70% of the value of the company as a whole in a sale occurring out-of-state with the vast majority of assets located out of state.[69]   The United States Supreme Court reiterated the strong economic basis for the three-factor method and concluded that California's taxation of income in the regular course of the taxpayer's business could be attributed in part to the state.  The Court expressly cited the fact that California's method of attribution of foreign subsidiary income, with proper application of the three-factor method, produced a difference of a mere 14% change in taxable income.  The Court compared that to the amount in *Hans Rees' Sons, Inc v North Carolina*, in which North Carolina attempted to apply a one-factor method of calculation (tangible property), resulting in an attribution of 66% to 85%.  However, a calculation including the reasonable economic value of the income-producing activities, including out-of-state sales, valued in-state income at 21%.  While in *Hans Rees' Sons* the Court concluded that the state applied an unreasonable and disproportionate method of taxation, the Court in *Container Corp* concluded that the difference in reasonable attribution of 14% was "a far cry from the more than 250% difference" in *Hans Rees' Sons*.[70]

---

[68] *Id*. at 174-175 & nn 11-12.

[69] *Id*. at 171-173, 180-182 (describing the sales and regular operation of the business, selling custom-ordered paperboard packaging, as well as the reduced cost of labor abroad and the ability to make greater profits in selling the goods in the regular course of business).

[70] *Id*. at 184.

Here, by comparison, the Department is using a one-factor method like in *Hans Rees'*

*Sons*. Unlike in *Container Corp*, but like in *Hans Rees' Sons*, the divergence in reasonable

attributable value is massive. The Department's calculation resulted in a 400% increase and a

rise from 15% to 70% in attribution from the reasonable values ML calculated, which itself was

favorable to the Department when compared with pre-Enbridge sales periods post-2000.

Considering sales alone, the calculations used by the Department constituted a more than 900%

increase from attribution of the company's recent average sales history to Michigan and a

2,100% increase from the company's post-2000 sales history prior to the Kalamazoo River oil

spill. This is not a reasonable attribution of regular business income in a unitary business like

that in *Container Corp*. This case falls decisively in the category of *Hans Rees' Sons* and other

precedents in which the Supreme Court declared unconstitutional taxation on out-of-state

economic activity and interstate commerce.[71]

---

[71] See *JD Adams Mfg Co*, 304 US at 310-311 (explaining that a tax on values occurring within the state, including sales or property taxes in state, was constitutional but that a tax on income from out-of-state business sales, without proper consideration of the location of sale, was unconstitutional); *Miller Bros*, 347 US at 343 (holding that a de facto tax on commercial sales occurring with out-of-state businesses, with delivery of goods out of state, was unconstitutional even if the state could tax the possession of the property by residents in state); *Gwin, White & Prince*, 305 US at 339-340 (holding that a tax on business sales not properly attributed to the state was unconstitutional and noting that, if the tax were permitted, the same economic activity could be taxed by other jurisdictions "with equal right"); *Norton Co v Dep't of Revenue of Illinois*, 340 US 534, 539; 71 S Ct 377; 95 L Ed 517 (1951) (striking down a tax on sales ordered by and delivered to in-state residents but received and completed out of state and upholding a tax on sales received and completed in state); *Underwood Typewriter Co*, 254 US at 121 (holding that taxation of income from sales of typewriters and kindred articles created and derived from manufacturing and property valued entirely *within the state* was constitutional); *Norfolk*, 390 US at 326-327 (striking down a taxing formula for railroads where its "rigid application" in the facts of a case created a substantial overvaluation as compared to "actual value" of in-state activities); *American Trucking Associations, Inc*, 483 US at 284-286 (concluding that a fee on property located within the state and consumption taxes for use of the property in the state were constitutional, but that a flat tax on property as part of a multistate business operation was

unconstitutional); *McGoldrick*, 309 US at 57-58 (explaining that a tax on a sale occurring within a state and involving deliveries in state was constitutional and did not involve taxation of out-of-state activity).

The majority opinion narrows its gaze in ignoring the basic principles underlying Supreme Court caselaw in this area. *Ante* at 48 n 24 (declining to acknowledge the basic precepts of Supreme Court precedents). The Supreme Court precedents in this area repeatedly rely on each other as reference points to decide the question at issue in this case: does the tax apply to in-state economic values or does the tax apply to extraterritorial values? See above citations and notes 32, 37, and 41 through 42 of this opinion (collecting sources); see, e.g., *Standard Pressed Steel Co v Washington Dep't of Revenue*, 419 US 560, 561-563; 95 S Ct 706; 42 L Ed 2d 719 (1975) (comparing the tax on sales for an interstate business to *Norton*, 340 US 534, and explaining that "[t]he disagreement in the Court was not over the governing principle; it concerned the burden of showing a nexus between the local office and interstate sales"). The analysis in Supreme Court opinions is greater than the immediate facts before them. The repeated citation in the majority opinion to the notion that a state can tax economic values occurring within its jurisdiction, even if the activities underlying those values are derived from multistate unitary business operations, is as accurate as it is unhelpful for the majority opinion's holding. *Ante* at 34-35. In not one of the cases cited in the majority opinion has the United States Supreme Court approved the taxation of substantial economic value which by any reasonable measure occurred outside the state. See also note 77 of this opinion.

A state *could* place a tax on only one factor of economic activity when application of that formula is reasonably attributed to those in-state activities. See, e.g., *Standard Pressed Steel Co*, 419 US at 561-564 (holding that a gross receipts tax on the sale of a company to an in-state customer, after using an employee in the state to offer the sale, negotiate it, design the product, and respond to the customer's concerns, was a proper valuation of in-state activity and indicating that the tax at issue was "apportioned exactly to the activities taxed") (quotation marks and citation omitted); *Moorman Mfg Co v Bair*, 437 US 267, 269-270, 272-276; 98 S Ct 2340; 57 L Ed 2d 197 (1978) (explaining that an income tax on animal-feed sales that attributed income directly from property to the location of property and the remainder of income based on the location of the sale was constitutional given the default presumption of constitutionality and that the taxpayers failed to present any record as to where economic activity occurred or where profits were received; noting that "the *application* of a single-factor formula to a particular taxpayer" can be unconstitutional but that the taxpayer in that case presented no record); see also cases cited above; notes 32, 37, and 41 through 42 of this opinion. However, relying on one factor alone, notwithstanding the economic realities of the business's operations, can in some cases create substantially disproportionate and extraterritorial taxation, like the tax the Supreme Court held was unconstitutional in *Hans Rees' Sons*.

That is why Michigan's own business income tax statute creates a safety valve, allowing the Department to apply an alternative method of apportionment. See MCL 208.1309. The

The Supreme Court's decision in *Trinova v Mich Dep't of Treasury* also supports the conclusion that the instant tax is unconstitutional.[72]  Like in *Container Corp*, the state was attempting to tax income derived in the regular course of business of a unitary commercial operation, not a mass asset sale of corporate properties.[73]  And in *Trinova*, the Department attributed income using the three-factor method, which resulted in an attribution of 9% to the state.  Notably, the Department chose not to apply a sales-only method, which would have attributed 27% of income to Michigan.  The company in *Trinova* argued that the location of sales must be fully excluded from consideration on income attribution.[74]  The Supreme Court rejected

statute recognizes that isolating direct-to-consumer sales away from all other economic consideration can create substantial distortions in specific cases.  And that is true here.  Direct-to-consumer sales may have been appropriate if the income derived from ML during the 2011 short year was mostly or even significantly from direct-to-consumer sales or other regular business operations.  But instead, the Department applied this selective method of apportionment in an abnormal and distorted tax year to income derived almost entirely from a massive $88 million out-of-state corporate asset sale.  The Department does not provide any material dispute that the vast majority of the short-year income resulted from ML's asset sale, which the record shows was 93% of ML's total short-year income; the Enbridge contract in Michigan was merely 4% of ML's total short-year income.  Vectren provided an extensive record demonstrating the nature and characteristics of its economic activities and assets, almost all of which are accurately sourced out of state.  Considering the actual source of the economic activity derived from ML's short-year income, based on the location of the assets and values underlying ML's company-wide sale, the Department's attribution of taxable value to Michigan is extraordinary and unconstitutional.  The majority opinion's claim that enforcing basic constitutional limitations against extraterritorial taxation is "legislation" appears, in application, to be an appeal to eliminate those safeguards altogether.  *Ante* at 30-31.  It is neither democratic nor constitutional for a state to tax activities that cannot be reasonably attributed to its own jurisdiction.

[72] *Trinova*, 498 US 358.

[73] See *id*. at 368-370, 376-379 (describing the business's source of income from sales in automobile parts, the attributions within each state from a manufacturing supply chain, and the value of in-state sales of the components directly to consumers).

[74] *Id*. at 381 ("Trinova proposes an alternative two-factor apportionment, excluding the sales factor.").

that argument, reiterating its position that proper valuation of a company's property, workforce, and location of sales is a reasonable, if not preferred method of tax allocation.

In *Trinova*, the tax attribution went from 0.2% when ignoring sales to 9% when using the benchmark three-factor method. While the change was large in terms of percentage difference, it was in aggregate relatively small. Here, the Department is attempting to increase taxation by orders of magnitude using direct-to-consumer sales only, increasing the attribution of income to Michigan from 14%—using Vectren's calculation—to a staggering 70%. Further, unlike the plaintiff in *Trinova*, Vectren is not attempting to exclude the location of sales from attribution in taxation. In fact, Vectren is attempting to vindicate the value of sales as an economic factor by considering in its attribution of tax the reality that ML's short-year income was derived almost entirely from out-of-state sales of out-of-state assets. Goodwill and intangible values, as part of those assets, are derived from historical business, expertise, and direct-to-consumer sales, which almost exclusively occurred out of state. Not only did Michigan in this case refuse to consider property and workforce as a source of economic value, it also did not consider the location of sales when calculating the "value earned" inside the state.

In sum, the Department's tax calculation for the 2011 short year is unconstitutional. Given that this is a stock sale labeled as an asset sale, it is very likely that the income derived from ML's sale was subject to double taxation: once in Minnesota as a capital gain or pass-through income to ML's owners and twice in Michigan (and perhaps other states) as an asset sale to Vectren.[75] Almost certainly, Minnesota could have reasonably attributed most if not all

---

[75] It would be constitutional and abundantly fair for Minnesota to apply such a tax on income, rather than ML's property rights, given that the *actual economic value* of the income from ML's asset sale is almost entirely derived from Minnesota and surrounding states, not Michigan. *Mobil Oil Corp*, 445 US at 436-446 (reaffirming that a state can properly apportion income from

of ML's sale to that state.[76]  Such a tax on out-of-state economic activity is exactly what the

Constitution disallows.

## D.  THE MAJORITY OPINION

The majority opinion largely ignores the available record, restates arguments made by the

Department, and infers conclusions that are categorically taken in the light most favorable to the

multistate operations and rejecting an argument that income from intangibles such as dividends are per se not subject to apportionment, given that the use of "intangible property *involve*[*s*] *relations* with more than one jurisdiction," and in so doing reiterating the established principle that tax and any apportionment is constitutional so long as it is based on the "part" of unitary businesses "conducted in . . . States" and on the "intrastate values of the enterprise") (emphasis added).  As explained earlier, there is no economic difference between a stock sale and a company-wide asset sale for the recipients of the income.  It cannot be seriously debated that Michigan's apportionment in this case creates substantial risk of double taxation.  The majority opinion's implication that somehow Minnesota residents received favorable tax considerations for taxes paid to the Department by Vectren, an Indiana corporation, several years after the filing event strains credulity.  See Minn Stat 290.17(1)(a) ("The income of resident individuals is not subject to allocation outside this state."); Minn Stat 290.06(22)(a) ("A taxpayer *who is liable* for taxes based on net income to another state . . . upon income allocated or apportioned to Minnesota, is entitled to a credit for the *tax paid* to another state if the tax is *actually paid* in the taxable year or a subsequent taxable year.") (emphasis added); accord Minnesota Department of Revenue, *Taxes Paid to Another State Credit* <https://www.revenue.state.mn.us/taxes-paid-another-state-credit> (accessed July 25, 2023) [https://perma.cc/P672-YPWN]; see also Plaintiff's Court of Appeals Brief (December 7, 2018), p 24 (explaining in the context of a separate statutory argument that "[t]he gain on the Sale did not escape taxation" and "[t]he siblings paid Federal and state taxes as required"); *ante* at 43 (majority opinion denying any contention or implication of double taxation).

[76] See *Healy*, 491 US at 335-336 (explaining "the Constitution's special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres"); *JD Adams*, 304 US at 311 (reasoning that a tax on economic value best attributed to out-of-state activity would impose on "[i]nterstate commerce . . . the risk of a double tax burden to which intrastate commerce is not exposed," which "the commerce clause forbids"); *Trinova*, 498 US at 386 (stating the principal concern of the Constitution in preventing "serious concerns of double taxation" or taxing "revenues that, under the theory of the tax, belong of right to other jurisdictions").

Department, despite directing the entry of summary disposition in the Department's favor.[77] In so doing, the majority opinion largely leaves unaddressed the substantial record of value explained in this opinion. For the sake of simplicity, I will not restate in full the proper analysis, but will merely address specific areas of concern in the majority opinion.

The majority opinion relies heavily on presumptions made by the Department that Vectren was *really* purchasing ML in order to exploit the Michigan market, which has certain shale oil deposits in the Antrim formation.[78] This is confounding given that almost none of ML's historical activities occurred in Michigan, including in the immediate years leading up to the sale, and the in-state sales underlying the Department's 70% valuation of ML were due to an

---

[77] The majority opinion does not consider, address, or incorporate in its theory of value the massive weight of out-of-state assets in ML's corporate sale. It fails to consider pertinent details: the location of ML's real estate; the location and placement of its permanent equipment; the assignment of its permanent workforce; the location of ML's management and strategic development; the locations where ML built a consumer base, expertise, and a reputation; the state in which ML's contracts and property were legally owned; the location of ML's negotiation and asset sale; the emergency nature of the Enbridge contract; or the distortionary and highly selective horizon of time the Department chose to attribute direct-to-consumer sales to Michigan. The majority opinion restates the law on unitary business operations, notes that 70% of ML's direct-to-consumer sales immediately prior to the asset sale occurred in Michigan, and thereby concludes that the Department's apportionment is reasonable. But, as explained earlier, the unitary business doctrine is ultimately a tool to assess the actual value of in-state activities. While the Supreme Court has approved the use of apportionment of income when geographical taxation is impractical, it has never sanctioned the extension of state authority outside of its borders or the taxation of economic activity that has no reasonable attribution to the state. This is exactly such a case, in which Michigan is attempting to capture 70% of the value of an entire company derived from, built, and maintained on out-of-state economic activity. The record is undisputed that ML had very little footprint in Michigan leading up to the Kalamazoo River oil spill, and even then, the Department chose to apportion the value of the company based only on direct-to-consumer sales and only for the winter offseason when ML was responding to an environmental emergency.

[78] The majority opinion repeatedly relies upon Vectren's purported "future growth plans" for ML in Michigan.

42

emergency oil spill that is highly unlikely to frequently or consistently occur.[79] It is also inapposite given that the owner and signatory of the selling corporation, Christopher Leines, provided uncontradicted statements that ML had little to no involvement in the Michigan market, had no permanent placement or infrastructure there, and had no immediate plans to increase their presence or investment in the state. The president and signatory for the buyer, Douglas Banning Jr., provided uncontradicted testimony that the business and operations in Michigan, specifically the Antrim shale formation, did not determine or affect Vectren's considerations as to whether to purchase ML.[80] KPMG's market analysis to value existing customer relationships relied upon sales history from 2007 to 2010, and during that period, less than 15% of sales were attributed to Michigan, including the highly unusual Michigan-Enbridge contract. Of the customers ML marketed to potential purchasers, only Consumers Energy had regular business in Michigan. Sales to Consumers Energy equaled 8.6% of ML's total sales from 2007 to 2010 and no more than 3.5% of sales from 2001 to 2010.[81] It belies economic reality to claim that 70% of the value

---

[79] See note 9 of this opinion (explaining the unprecedented nature of the Kalamazoo River oil spill); see also National Oceanic and Atmospheric Administration Office of Response and Restoration, *Largest Oil Spills Affecting U.S. Waters Since 1969* <https://response.restoration.noaa.gov/oil-and-chemical-spills/oil-spills/largest-oil-spills-affecting-us-waters-1969.html> (accessed July 21, 2023) [https://perma.cc/BF8W-GWVH] (listing the dozens of oil spills that affected United States waterways and noting only the Kalamazoo River oil spill for Michigan).

[80] Banning testified that Vectren "never even looked at a shale play in Michigan at all" when considering whether to purchase ML. Any natural resource development in Michigan "didn't really enter into [Vectren's] acquisition criteria as far as whether we wanted to acquire [ML] or not." Similarly, when discussing ML's minor amount of historical sales to Michigan-based Consumers Energy, Banning testified that he did not even "know that . . . at the time" of ML's sale.

[81] By comparison, between 2007 and 2010, at least 23% of ML's sales derived from Enbridge-associated companies, and at least 33% of sales derived from contracts with Minnesota Pipeline.

of ML's consumer relations was derived from Michigan. Further, ML's reputation and experience were built over decades in Minnesota and surrounding states, and its future prospects concentrated on extraction and development of the Marcellus, Utica, and Bakken formations in North and South Dakota, Ohio, Pennsylvania, and West Virginia.[82] Unsurprisingly, after Vectren purchased ML and completed the Kalamazoo River oil spill contract, sales in Michigan returned to their historical norm—around 1% of total sales, or roughly $5 million. The only "hindsight-quarterbacking" is found in the majority opinion, which concludes that its analysis on speculative future markets overrides the sworn statements of the purchaser and buyer, the analysis performed by the accounting professionals at KPMG, and the substantial body of record evidence thoroughly demonstrating ML's out-of-state economic activities.[83]

---

Outside of the Kalamazoo River oil spill, all those services were provided outside of Michigan, including the vast majority of the sales to Enbridge. In 2010, ML received $15.6 million in revenue from Enbridge in Michigan due to the Kalamazoo Rive oil spill. Between 2007 and 2010, the time frame considered by KPMG, ML received at least $90 million in revenue from Enbridge contracts outside of Michigan.

[82] In his deposition, Banning explained that management at Vectren "thought the shale plays were going to be, you know, large. [Vectren] never even looked at a shale play in Michigan at all. Primarily Marcellus and the Utica in Ohio, Pennsylvania, West Virginia area, and then, you know, [Vectren] understood the Bakken [in North and South Dakota] from, you know, [ML's] work and what they were doing from that perspective." Banning repeatedly emphasized that, in terms of future market growth, Vectren was looking at the "Marcellus and Bakken shale plays." Vectren "did not specifically acquire [ML] to look at any shale plays other than Marcellus, Utica, and the Bakken," none of which are located in Michigan. In addition, Vectren wanted an "experienced management team" and prior relationships and experience with Enbridge, Koch, and Minnesota Pipeline, all of which are out-of-state companies to whom ML serviced almost entirely out-of-state for the duration of ML's history. See also note 53 of this opinion. The limited value of Michigan and the Antrim formation was entirely unsurprising given that almost all of the nation's shale extraction occurs outside of Michigan. See note 8 of this opinion.

[83] *Ante* at 39 (majority opinion).

The Department's argument, repeated in the majority opinion, is that ML advertised in a sales presentation that ML *could at some point in the future* develop into an undefined amount of business from Michigan and the Antrim shale formation. It should be wholly unsurprising to anyone acquainted with standard business practice that a seller of an asset will emphasize any and all possible methods in which the asset could be used in a hypothetical future context. That's a standard sales pitch; it says absolutely nothing about where the economic value grew and is actually sourced. The advertisement emphasized that Antrim was in ML's geographic "sweet spot." But that is as accurate as it is unhelpful. No one denies that ML's central location of business was Minnesota and neighboring states. Michigan and Minnesota are both located in the Midwest, which is the general geographical area the sales pamphlet was referring to.[84] Simply because ML *could* do business in Michigan does not mean that ML's value as a company was *actually developed* in Michigan, or that Vectren primarily valued ML's Michigan business. The actual value of the company, whether through real property, tangible property, or intangible property, was created almost entirely through business and locations outside of Michigan.[85]

Along the same theme, the Department also relied on a leading question its attorney posed to Banning. The attorney asked Banning if Michigan's Antrim formation would have been a "plus" for Vectren in purchasing ML. Unsurprisingly, Banning answered, "Sure." If anything, this amounts to a masterful non sequitur. The Department asked a business executive if it would

---

[84] The sales report explained that "[a] significant amount of the Company's work is concentrated in the Midwest which is a major pipeline crossroad connecting production in the Rocky Mountain and Western Canada regions with major markets in the Upper Midwest and east of the Mississippi." The report emphasized ML's "core Great Plains and Midwest geographies" no less than 10 times.

[85] See notes 47 through 57 of this opinion (discussing the attribution of corporate assets).

be a "plus" if he made more money than previously expected, and the executive answered, "Sure." Such testimony says nothing of Banning's uncontradicted testimony that Antrim and the Michigan market did not play a role in Vectren's decision to purchase ML, nor does it change the fact that almost all ML's property, services, and value were located outside of Michigan.

And how could it be otherwise? Under the logic of the Department and majority opinion, a state could attribute economic value on assets based on a theoretical projection on how assets could be used in an unknowable future. Such a standard amounts to pure speculation and is wholly arbitrary.[86] What markets the buyer is potentially interested in exploiting after a sale and a purchase of value would largely come down to the buyer's subjective perspective and intent, which in this case indisputably did not include Michigan. Under the Department's theory of speculative future markets, Ohio, Pennsylvania, and West Virginia could all reasonably tax 70% of ML's intangibles. Those states, like Michigan, had limited interaction with ML in terms of actual business activity and construction of value. Unlike Michigan, Vectren expressly considered those locations as important future opportunities.

When attempting to sell an asset for the highest price possible, a seller may emphasize several potential uses that cannot in any practical manner be fully exploited. A seller may say that a company *could* produce income from any number of sources, which if combined in aggregate can be orders of magnitude larger than what the company can actually perform.[87]

---

[86] See *Container Corp*, 463 US at 164-165 (explaining why the unitary business doctrine was adopted and its purpose of replacing accounting methods that are "subject to manipulation" and do not appropriately calculate the "transfers of value that take place among the components of a single enterprise").

[87] If a seller of a food truck in Michigan pressed to a potential buyer that the buyer could use the truck to drive to California, Miami, or New York City this summer and sell food, no reasonable person would believe that, solely because of this comment, the economic value of the truck is,

46

That is why provable values of use and activity, not theories, hopes, and best wishes, underlie proper determinations of value. Under accepted tax principles, property is sourced to its situs, sales are taxed at the location of sales, intangibles are sourced to the residence of the owner or where they are employed, goodwill is generally sourced to the location in which the company's activities occurred and the goodwill was cultivated, and income is sourced with all these considerations in mind, including the location of the sale and the labor and property underlying the sale.[88] The Department's method of apportionment, sanctioned in the majority opinion, not only creates the serious risk of double taxation,[89] it conflicts with basic economics.

## III. CONCLUSION

In providing invaluable services while responding to one of the largest interior oil spills in United States history, ML got caught in a web of Michigan corporate taxation. In retrospect, ML should have done things differently. It should not have taken the Enbridge contract, or it should have ceased its operations in Michigan during the 2011 short year, notwithstanding any

---

in fact, located in California, Florida, and New York all at once. It would be even more shocking if California, Florida, or New York seriously argued that a substantial portion of the income derived from the truck sale is taxable in those jurisdictions. The unitary business principle does not in any way interfere with or undermine this basic reality of reasonable economic valuation.

The majority opinion's implication that ML's owners may be held liable for advertising how their assets *could* be used at some future point in time is confounding, *ante* at 38 n 17, and merely distracts from the majority opinion's reliance on suggestions in a sales presentation for its theory of economic value.

[88] See notes 32, 37, 45-48, 50-52, 54-57, 62-64, and 71 of this opinion.

[89] See, e.g., *JD Adams*, 304 US at 311 (holding that, when applying a tax without reasonable apportionment, "[i]nterstate commerce would thus be subjected to the risk of a double tax burden to which intrastate commerce is not exposed, and which the commerce clause forbids"); see also *MeadWestvaco Corp*, 553 US at 24-25 (explaining the dual nature of the Commerce Clause and Due Process Clause).

immediate need from the citizens or government of Michigan. Alternatively, Vectren and other potential buyers of ML should have refused to purchase the company until ML's operations in Michigan concluded. And the demands of buyers would no doubt influence the behavior of a seller like ML. Regarding tax planning going forward, an out-of-state company should not perform any major asset sale or corporate reorganization potentially triggering a taxable event while simultaneously providing unprecedented or emergency services in Michigan. Taxpayers in ML's position, which have minimal contacts with Michigan and have family owners who wish to sell after decades in the business, will no doubt favor the efficient sale of their company over investing in this state. Such a tax environment will foster business uncertainty, increase the risk of double taxation, and establish a disincentive for interstate business in Michigan. After today's decision, out-of-state companies must remain exceedingly vigilant to limit and regulate their business operations in Michigan, lest unforgiving tax authorities seek an enormous apportionment in taxes. Businesses, especially those providing emergency services, can decide for themselves whether they are comforted by the assurances in the majority opinion that disproportionate taxation in this case is "unlikely to repeat" itself.[90]

As the unanimous panel of the Court of Appeals below held, such a result is not demanded by the law. Michigan's tax statutes expressly recognize the fact that standard methods of apportionment, which work well for retail and other regular business activities, can impose disproportionate and inaccurate attribution for individual taxpayers. Statutes give the Department flexibility to pragmatically respond to taxpayers in the state and apply a fair apportionment calculation. That should have been the case with ML, which by happenstance

---

[90] *Ante* at 6.

sold its entire company during an unusual three-month period in which nationwide sales were low and Michigan's direct-to-consumer sales soared to unprecedented levels due to an environmental emergency. Despite ML submitting a generous apportionment of 15% of the entire company, the Department refused to apply Michigan's statutory safety valve for disproportionate taxation and instead imposed an extraordinary 70% apportionment. The tax imposed by Michigan in the 2010 tax year is excessive and unreasonable given the underlying in-state value provided by ML's activities. It is unconstitutional.

There are substantial limitations on taxpayers filing suit in federal court, but without federal guidance, states such as Michigan will continue to push the boundaries of interstate taxation.[91] When revenue is in reach and budgets are strained, taxing authorities have little incentive for restraint. As always, the most favored target for tax increases are foreigners. Other states may respond, whether by inspiration or retaliation, and more businesses and individuals will be caught between two fires. A sound and consistent system of interstate commerce will suffer as a result. For the foregoing reasons, I dissent.


Brian K. Zahra
Elizabeth T. Clement

---

[91] See 28 USC 1341 (the Federal Tax Injunction Act); *Levin v Commerce Energy, Inc*, 560 US 413, 424; 130 S Ct 2323; 176 L Ed 2d 1131 (2010) ("[B]ased on comity concerns . . . 42 U.S.C. § 1983 does not permit federal courts to award damages in state taxation cases when state law provides an adequate remedy.").

STATE OF MICHIGAN

SUPREME COURT

VECTREN INFRASTRUCTURE
SERVICES CORP., successor in interest to
MINNESOTA LIMITED, INC.,

      Plaintiff-Appellee,

v                                       No. 163742

DEPARTMENT OF TREASURY,

      Defendant-Appellant.

_____

VIVIANO, J. (*dissenting*).

I dissent largely for the reasons laid out in Justice ZAHRA's dissent, specifically its in-depth analysis of the facts. That analysis demonstrates that Vectren, as the party challenging the tax, has met its burden of proving "by clear and cogent evidence that the income attributed to [Michigan under the statutory apportionment formula] is in fact out of all appropriate proportions to the business transacted in that State, or has led to a grossly distorted result." *Container Corp of America v Franchise Tax Bd*, 463 US 159, 170; 103 S Ct 2933; 77 L Ed 2d 545 (1983) (cleaned up).[1] As a result, Vectren is entitled to use a

---

[1] See also MCL 208.1309(3) ("The apportionment provisions [under Michigan's business tax code] shall be rebuttably presumed to fairly represent the business activity attributed to the taxpayer in this state, taken as a whole and without a separate examination of the specific elements of either tax base unless it can be demonstrated that the business activity attributed to the taxpayer in this state is out of all appropriate proportion to the actual business activity transacted in this state and leads to a grossly distorted result or would operate unconstitutionally to tax the extraterritorial activity of the taxpayer.").

reasonable "alternate method" of apportionment.[2]  I write to offer additional reasons why I believe that is so.

Unlike Michigan, some states apply a three-factor formula for purposes of determining the amount of business income that is allocable to the state.  See *Container Corp*, 463 US at 170.[3]  The three factors that constitute the formula are payroll, property, and sales.  *Id*.  The United States Supreme Court has described the three-factor formula as "something of a benchmark against which other apportionment formulas are judged."  *Id*. The formula, while imperfect, has "a powerful basis in economic theory" and "has gained wide approval precisely because payroll, property, and sales appear in combination to reflect a very large share of the activities by which value is generated."  *Id*. at 183 & n 20. Additionally, the three-factor test can insulate what might otherwise be an unconstitutional apportionment when one factor offsets a potential distortion based on the other factors. *Trinova Corp v Dep't of Treasury*, 433 Mich 141, 164; 445 NW2d 428 (1989) (holding an apportionment constitutional because the large "sales figure" "offset" the "very small

---

[2] What that method would be and how it would be determined are questions that would need to be answered on remand, if my view had prevailed.  See generally MCL 208.1309(1) and (2).

[3] Since *Container Corp* was decided, many states have adopted a single-factor sales formula.  See Federation of Tax Administrators, *State Apportionment of Corporate Income* <https://taxadmin.memberclicks.net/assets/docs/Research/Rates/apport.pdf>  (accessed July 28, 2023) [https://perma.cc/QL5C-6HVZ] (listing state apportionment formulas as of January 1, 2022); see generally Hellerstein, *The Transformation of the State Corporate Income Tax into a Market-Based Levy*, 130 J Taxation 4, 5 (2019) (discussing the history of state corporate income taxes and the transition from single-factor property formulas to the "equally weighted three-factor formula" of property, payroll, and sales to the present-day trend of using single-factor sales formulas).

percentage of [the taxpayer's] total business activity" represented by the payroll and property factors).

On the other hand, the United States Supreme Court has been more critical of single-factor formulas. See *Container Corp*, 463 US at 182-183 ("Some methods of formula apportionment are particularly problematic because they focus on only a small part of the spectrum of activities by which value is generated. Although we have generally upheld the use of such formulas, we have on occasion found the distortive effect of focusing on only one factor so outrageous in a particular case as to require reversal.") (citation omitted). Particularly relevant to this case, the Court has "expressed doubts about the wisdom of the economic assumptions underlying the [single-factor sales] formula and noted that its use in the context of the more prevalent three-factor formula would not advance the policies underlying the Commerce Clause." *Moorman Mfg Co v Bair*, 437 US 267, 275 n 8; 98 S Ct 2340; 57 L Ed 2d 197 (1978). Despite its criticisms of the single-factor sales test, however, the Court has "made clear that it did 'not mean to take any position on the constitutionality of a state income tax based on the sales factor alone.' " *Id*. at 275, quoting *Gen Motors Corp v Dist of Columbia*, 380 US 553, 561; 85 S Ct 1156; 14 L Ed 2d 68 (1965). Indeed, the Court rejected a categorical challenge to the use of a single-factor sales formula in *Moorman*, 437 US at 276.

Thus, while application of a three-factor formula is not constitutionally required, it is a helpful benchmark for determining whether application of a different formula attributes income in a way that is "out of all appropriate proportions to the business transacted in

th[e] State, or has led to a grossly distorted result." *Container Corp*, 463 US at 170 (cleaned up).[4]

When a unitary business, such as Vectren, is challenging a state's application of its statutory apportionment formula, the business generally cannot invoke "separate geographical accounting" to challenge apportionability. *Mobil Oil Corp v Comm'r of Taxes of Vermont*, 445 US 425, 438; 100 S Ct 1223; 63 L Ed 2d 510 (1980). However, when considering the question of proper apportionment, "evidence may always be received which tends to show that a state has applied a method, which, albeit fair on its face, operates so as to reach profits which are in no just sense attributable to transactions within its jurisdiction." *Hans Rees' Sons, Inc v North Carolina*, 283 US 123, 134; 51 S Ct 385; 75 L Ed 879 (1931).[5]

---

[4] When measuring the extent of distortion, the Supreme Court has looked to "the percentage increase in taxable income attributable to [the state] between the methodology employed by [the taxpayer] and the methodology employed by" the state. *Id*. at 184. See generally Hellerstein & Hellerstein, State Taxation (3d ed, May 2023 update), § 8.16[5] ("Insofar as the extent of distortion is relevant to the constitutionality of the application of an apportionment formula, it becomes important to determine the appropriate means of measuring the distortion. . . . In [*Container Corp*], the Court established the proper standard for determining the percentage of distortion—namely, comparing the percentage differences between the application of the different methodologies."). It would have been helpful for Vectren to have provided a comparison of the application of the statutory apportionment with the apportionment that would have resulted from application of the benchmark three-factor test instead of merely providing a comparison to what appears to be a novel alternative apportionment of including the sale of ML's assets in the denominator of the sales factor. But because it is clear that application of the statutory apportionment is out of all appropriate proportions or leads to a grossly distorted result, I do not find this failure fatal to Vectren's position.

[5] See generally Hellerstein & Hellerstein, § 8.16[1] ("*Hans Rees* does stand for the proposition that separate accounting evidence of the geographic source of income is probative of unconstitutional distortion if the difference between the result under separate accounting and the result under formulary apportionment is sufficiently great—'out of all

As explained by Justice ZAHRA, Vectren provided extensive evidence that the sale value of Minnesota Limited Inc. (ML) was generated from assets and activities almost entirely outside of Michigan. The asset sale was not included in either the numerator or the denominator of the single-factor sales formula. Rather, it was included only in the business income portion of the formula. In other words, although the statutory apportionment formula treated the sale as taxable income, it completely failed to consider whether the profits from the sale were in any "just sense attributable to transactions within" Michigan. *Hans Rees' Sons*, 283 US at 134.[6] And because sales constitute the only factor, the formula is incapable of accounting for other variables to offset this distortion. Cf. *Trinova*, 433 Mich at 164.

The majority relies on *State Tax Assessor v Kraft Foods Group, Inc*, 235 A3d 837; 2020 ME 81 (2020), in which the Maine Supreme Judicial Court upheld the state's application of its statutory single-factor sales formula to assess tax on Kraft's sale of a portion of its business to another company. *Ante* at 27. More specifically, the majority

---

appropriate proportion' to the taxpayer's activities in the taxing state."), quoting *Hans Rees' Sons*, 283 US at 135.

[6] Some commentators have recognized that the United States Supreme Court has not recently invalidated an apportionment formula on the basis of it producing a gross distortion. See, e.g., Hellerstein & Hellerstein, § 8.16[1]. However, these same commentators have intimated that single-factor formulas might be more susceptible to a constitutional challenge than the benchmark three-factor formula. See, e.g., *id*. at § 8.15 ("Whatever may be the difficulties of showing the unfairness of an apportionment when a state employs [a] single-factor formula, those difficulties are exacerbated with a multifactor formula, particularly the once familiar three-factor formula of property, payroll, and sales . . . ."); *id*. at § 8.16[6] (raising "the question whether the application of the states' single-factor sales formulas will be more vulnerable to claims of unconstitutional distortion than the three-factor formulas that states generally employed for many years").

analogizes ML's substantial spike in income from the sale of its assets to Vectren to the spike in income derived from the sale in *Kraft Foods Group*. The Maine Supreme Judicial Court opined, "The fact that Kraft's net income in 2010 was much greater than in previous years does not support the conclusion that the sales factor itself does not fairly represent the extent of the taxpayer's business activity in Maine." *Kraft Foods Group*, 235 A3d at 844 (cleaned up). The majority concludes that the same is true here.

But the majority ignores a key part of the Maine Supreme Judicial Court's rationale for concluding that the spike in income did not render the sales factor unconstitutional:

> Kraft's Maine sales factor for 2010 was 0.007026 (0.7026%), which falls right between its 2008 and 2009 sales factors—0.006971 (0.6971%) and 0.007370 (0.7370%), respectively. This demonstrates that the extent of Kraft's business activities in Maine did not change significantly during those years. Although Kraft's total taxable income in 2010 was substantially larger than in previous years because of the sale, the sales factor, which represents Kraft's business activity in Maine relative to its total business activity, remained consistent with the sales factors from other tax years." [*Id*.]

The court made clear that "[t]he question is not whether the sales factor fairly represents the sale income; the question is whether the sales factor fairly represents the extent of Kraft's business activity in Maine." *Id*. at 845. Thus, it rejected Kraft's argument "that the 'unusual, non-recurring, and extraordinary [spike in income from the sale of part of its business] cannot be fairly represented by a single-sales factor formula determined in principal part by gross receipts from Kraft's day-to-day food product sales.' " *Id*.

In contrast here, and as the Court of Appeals recognized, the Michigan sales factor during the 2011 short tax year is far from consistent with the sales factors from previous years. The sales factor went from less than 1% in 2007 and 2008 to 18.5% in 2009, then to 39.3% in 2010, and finally to 70% in the 2011 short tax year. The purpose of the

6

statutory sales factor is to provide a "rough approximation of a corporation's income that is reasonably related to the activities conducted within the taxing State." *Moorman*, 437 US at 273. As the Maine Supreme Judicial Court recognized, when the sales factor is consistent over the years and accurately reflects the extent of the business's activity in the state, that purpose is achieved. *Kraft Foods Group*, 235 A3d at 844. However, when the sales factor varies, that might be an indication that it does not accurately reflect those activities, and therefore the proxy is less reliable. Thus, while the sales factor was a reliable proxy to determine how much of the company's income is attributable to Maine in *Kraft Foods Group*, the same cannot be said in this case. To be clear, the question is not whether application of the single-factor sales formula "fairly represents" the income from the sale of ML's assets to Vectren. *Id*. at 845. Rather, the question is does application of that formula "fairly represent[] the extent of [ML's] business activity in" the state? *Id*. For the reasons stated above, I would conclude that the answer is "No."

For the reasons outlined above and those in Justice ZAHRA's dissenting opinion, I would hold that Vectren has proved by "clear and cogent evidence that the income attributed to [Michigan under the statutory apportionment formula] is in fact out of all appropriate proportions to the business transacted in that State, or has led to a grossly distorted result." *Container Corp*, 463 US at 170 (cleaned up). I respectfully dissent.

David F. Viviano

7